**UNITED ELECTRICAL, RADIO AND MACHINE WORKERS OF AMERICA, United Electrical, Radio and Machine Workers of America, Local 610, Michael Murphy, James Cappetta and Edward Kristofik, Plaintiffs,**

v.

**William BROCK, Secretary of Labor, U.S. Department of Labor, Defendant.**

Court No. 86–11–01409.

United States Court of International Trade.

Feb. 27, 1990.

United Elec., Radio and Mach. Workers of America, Robin Alexander, Neighborhood Legal Services Ass'n, John Stember and National Employment Law Project, Elizabeth S. Hough, for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, and Elizabeth C. Seastrum, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

RESTANI, Judge:

Plaintiffs, representing workers at Union Switch & Signal division of American Standard, Inc., challenge the final partially negative determination of the Secretary of Labor regarding their petition for certification for Trade Readjustment Assistance. This

1. For a detailed history of this case prior to August 13, 1987, along with a summary of the applicable statutes, see *United Elec., Radio &*

matter is before the court for the third time.[1]

In this case, the union representing workers at a Swissvale, Pennsylvania plant of Union Switch & Signal Division of American Standard, Inc. (Company) petitioned the Department of Labor (Labor) on January 17, 1986 for trade adjustment allowance certification under 19 U.S.C. § 2271 (1988). Employment at the plant, which produced railway control systems, had been in decline from 1983 until the plant shut down in 1987. Petitioners appealed Labor's initial negative determination to this court during which time Labor became aware that it had not properly investigated allegations by petitioners that the Company had been substituting foreign imports for some products produced at Swissvale. Labor asked this court to remand the case for further investigation.

Following the first remand, the case was again remanded to Labor with directions that plaintiffs be afforded access to the confidential information which Labor had elicited from the Company. Plaintiffs were allowed the opportunity to submit a brief commenting on the confidential information, along with any other responsive materials which they deemed necessary. *United Elec., Radio & Machine Workers of America v. United States*, 11 CIT 590, 597, 669 F.Supp. 467, 472 (1987).

After receiving the confidential information, plaintiffs submitted affidavits and documentary evidence rebutting the Company's assertion that it was not substituting imports for items normally produced at its plant in Swissvale. Labor next provided this evidence to the Company for comment. Labor provided the Company's responses to plaintiffs, who then submitted additional material and argued that the Company was not providing complete and reliable information. The Company received plaintiffs' new information and provided a set of final responses. Plaintiffs then submitted a fi-

*Mach. Workers of Am. v. United States*, 11 CIT 590, 591–94, 669 F.Supp. 467, 467–69 (1987).

nal memorandum. Plaintiffs' Brief (P. Brief) at 4.

On July 14, 1988, Labor issued a revised determination. It appears that while Labor acknowledged that other sections of the Swissvale plant were affected by imports, it was not convinced to revise its 1987 decision to certify only three sections of the plant (60 out of approximately 500 workers). Labor, however, has now asked for a partial remand to review the effect of imported Canadian office control panels on employment at the plant.

## DISCUSSION

Plaintiffs present this court with two major issues. First, was Labor's decision to certify only three sections of the Swissvale plant based on substantial evidence? Second, did defendants deny plaintiffs' statutory and/or Constitutional rights of due process by not holding a full adjudicatory hearing on the record with rights of cross-examination as provided by the Administrative Procedures Act (APA), 5 U.S.C. §§ 554, 556, 557 (1988)?

### I. *Substantial Evidence for Denial of Certification.*

This court must uphold the finding of the Secretary if supported by substantial evidence. 19 U.S.C. § 2395(b) (1988). As this court has noted, "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Am. Spring Wire Corp. v. United States*, 8 CIT 20, 21, 590 F.Supp. 1273, 1276 (1984) (*quoting Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (other citations omitted)). While the reviewing " 'court may not substitute its judgment for that of the [agency] when the choice is "between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*," ' " 8 CIT at 22, 590

F.Supp. at 1276 (citation omitted), it must "tak[e] into account ' "whatever in the record fairly detract[s] from the [agency's] fact finding as well as evidence that supports it" '." (citations omitted) *Id.*

In order to certify a group of workers as eligible for adjustment assistance, the Secretary of Labor (Secretary) must determine that the three criteria in Section 222 of the 1974 Trade Act are met. They are:

(1) that a significant number or proportion of the workers in such workers' firm or an appropriate subdivision of the firm has become totally or partially separated, or are threatened to become totally or partially separated,

(2) that sales or production, or both, of such firm or subdivision have decreased absolutely, and

(3) that increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation, or threat thereof, and to such decline in sales or production.

19 U.S.C. § 2272(a) (1988).[2]

There is no dispute that plaintiffs have satisfied the first two conditions for certification. Defendant's Brief (D. Brief) at 5. The fundamental issue before the Secretary was whether importation of products which directly competed with those produced and tested at the Swissvale plant contributed importantly to worker separations. Labor found that this third factor was met with regard to only sections 110, 222, and 390 of the Swissvale plant.

The three major items involved in this litigation are office control panels imported from Canada, train stop kits imported from Italy, and relay frames imported from Korea. The court will look at each item in turn.

**2.** For the purposes of part (3) of this statute both at the time the petition was brought on January 17, 1986, and presently as amended, " 'contributed importantly' means a cause which

is important but not necessarily more important than any other cause." 19 U.S.C. § 2272(b)(1) (1988).

## A. *Canadian Office Control Panels.*

■ Plaintiffs allege that the Company imported large office control panels from Canada which contributed importantly to worker separation in nearly every section of the plant. P. Brief at 10–11, Plaintiffs' Appendix at 5–9. Plaintiffs requested that Labor obtain the "travelers" of a display panel for its investigation. According to Labor,

> [t]he "travelers" were documents that followed a specific job through the several plant departments but company officials stated that these records were not retained once a job was completed. However, process sheets—which contain the information on the "traveler" plus additional information on costs were available and were obtained for typical panel production operations. In addition a complete cost sheet for the production of an average panel was obtained plus detailed employee lists by Department.

A–54.[3] This information, which included the man-hours used up in various divisions of the plant during construction of a "typical" panel was included in the administrative record at A–29–37, 43, pursuant to Labor's subpoena. A–26. Moreover, a Company vice president informed Labor at a meeting on May 18, 1987, that Swissvale would produce about 25 panels in a typical year. A–28. In a phone conversation with Labor, the official stated that only three sections of the plant were affected by importation of Canadian office panels: Fabrication Department 110, Systems Wiring Department 222, and Plating Department 390. *Id.* On this basis, Labor, in its revised determination, certified these and only these three sections of the plant. A–57, C–198.[4]

Evidence in the record, however, indicates that the information which the Company provided to Labor refers not to an office panel, but rather to a "B–30" panel which is much smaller, less complicated, and takes many fewer man-hours to construct. C–52–55, C–77–80. Plaintiffs also contend that "the bill of materials the company provided does not list all of the parts used in an office panel. Each individual part, in turn, has its own route sheet and bill of materials. Therefore, to determine the actual time and all the sections involved in production, [Labor] would need the bill of materials and route sheets for the panel and all of its component parts." P. Brief at 13.

According to the affidavit of a former general foreman at the Swissvale plant, another reason that the Company-supplied information did not lead Labor to conclude that the importation of Canadian office control panels affected more than three sections was that

> [p]rocess Sheets alone may not reflect how a part is actually made. It was very common for other sections of the plant to perform an operation which, according to the process sheet, was performed elsewhere. For instance, there were certain operations which had to be performed on the office control panels and frames which were listed on the Route Sheets as performed by Section 110. In actuality, they were performed by the machine shop. A change of this type would be reflected on a "move ticket," which is not part of the Process Sheet but is used by [the Company] to bill customers.

C–78–79.

Defendant now concedes that a question remains as to the impact of imported Canadian panels on employment at the plant and requests the court to remand the case to Labor for further fact-finding on this point. This court grants Labor's request. If Labor does not accept plaintiffs' assertion that importation of Canadian office panels contributed importantly to worker separation in nearly every section of the plant, then the Secretary must obtain a bill of materials and route sheets for an office panel and all of its component parts, as well as enough "move tickets" to show how office panel production typically affected

---

**3.** The prefix "A–" refers to the administrative record which Labor compiled upon the first remand investigation.

**4.** The prefix "C–" refers to the administrative record which Labor compiled upon the second remand investigation.

other divisions of the plant. Labor must also obtain reliable documentary evidence as to how many office panels were produced at Swissvale in a typical year. If any of the foregoing information is unavailable or does not resolve the issue of the impact of the importations, then Labor may obtain explanatory statements from Company officials. If plaintiffs produce evidence contradictory to such explanatory Company statements, however, such statements may be relied on to deny eligibility only if the Secretary produces the author of the statement at a hearing. The conduct of such hearing and the reasons for these specific instructions are discussed, *infra*, at 1094–95.

### B. *Italian Train Stop Kits.*

■ Plaintiffs contend that Unit Shop III of the Swissvale plant steadily lost employees between 1983 and 1986 because train stop kits, formerly produced at the plant, were being imported from Italy.[5] Defendant, however, determined that

> [p]roduction of such kits was transferred to the company's Georgia facility in early 1986. A one-time import order for train stop kits was placed in 1983 and amended in 1984. According to company officials, no layoffs at Swissvale occurred as a result of this one-time occurrence.

A–56. *See also* C–195.

Defendant claims that the Company placed its order for Italian kits too early to affect employment during the relevant time frame (approximately calendar year 1985). *See* B–366.[6] A follow up change order in the confidential portion of the Administrative Record is evidence to the contrary. B–368 (dated 12/19/84). Moreover, a former general foreman of Unit Shop III stated in his affidavit that

> [t]he trainstop kits were always produced in Swissvale Unit Shop III ... If we had received a million dollar order[7] after

1983 a good number of layoffs would have been averted after 1984.

C–82.

Defendant, on the other hand, remarks that the above quoted individual

> ... was unable either to state that the Italian train stop kits were in fact imported or to identify definitely the impact of the imports. Moreover, his statement concerning the order is in the conditional —"*If* we had received ... kits ... layoffs *would have been* averted." *Id.* Thus, the union is unable to demonstrate, based on first-hand knowledge of the workers, when the kits were imported and the nature of their impact.

D. Brief at 17.

This court cannot discern the logic in defendant's claim that the former general foreman's use of the conditional weakens plaintiffs' case. Moreover, defendant's contention that plaintiffs did not provide first hand testimony from workers that Italian train stop kits were received is in error. Two employees swore in an affidavit that they personally saw Italian train stop kits come into the Swissvale plant. According to the two employees, these items were always repackaged and relogoed to make it appear that they had been produced at Swissvale. *See* C–65–67. On the other hand, even if these allegations are true, it does not necessarily mean that a significant enough number of train stop kits were imported so as to affect employment. This requires examination of other evidence.

Defendant relies on a statement by a Company vice president that the purchase order to Italy did not cause layoffs at Swissvale. A–28. Labor also relied on Company assertions that it used domestic sources and transferred production at Swissvale to a Company plant in Macon, Georgia in early 1986. *Id.* Plaintiffs dispute this, citing evidence in the record that the Macon plant performed only assembly and that the Company transferred all pro-

---

**5.** The record at C–82 indicates that Unit Shop III did lose employees during this period.

**6.** The prefix "B–" refers to purchase orders in the administrative record.

**7.** The order was in this neighborhood. B–366.

duction to outside vendors. C–127. This is an important issue because the Secretary based his negative determination on, *inter alia*, his finding that "[p]roduction of train stop kits was transferred to the company's Georgia plant in early 1986. A domestic transfer of production would not provide a basis for certification." C–190.

Taken in isolation, the Company's assertions might be sufficient evidence to support the Secretary's determination. "The substantiality of evidence [, however,] must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp., supra,* 340 U.S. at 488, 71 S.Ct. at 464. Moreover, "a reviewing court is not barred from setting aside a[n agency] decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the [agency's] view." *Id.* This court notes that statements by the Company regarding its import practices have previously been found false and misleading. *United Elec., supra,* 11 CIT at 593 & 596, 669 F.Supp. at 469 & 471. Given this background, the court is not convinced that this area has been adequately investigated.

Finally, defendant makes much of the fact that the Italian train stop kit order was a "one time order." The relevant questions here are: (1) how did a million dollar order to a foreign source affect employment at Swissvale during the relevant time period and (2) did the Company simply cease doing this work at Swissvale and continue importing with assembly at Macon? There appears to be strong evidence that the order affected employment during 1985. That the Secretary did not find evidence of further orders in 1986 is probably irrelevant.

While this court declines to hold that plaintiffs have proven that the record can only be read to support the proposition that imported Italian train stop kits contributed importantly to worker separations, the court does hold that the Secretary's determination that such imports did not so contribute was not based on substantial evidence. There were simply too many errors and too many unexplained avenues of appropriate investigation to uphold the Secretary's decision. Therefore, the court remands this question to the Secretary for further investigation on the effect of importation of train stop kits on employment at the Swissvale plant during 1985, with proper regard for the size of the order in comparison to plant production. As part of this inquiry, Labor must determine whether production, as opposed to simply assembly, actually took place at Macon during the relevant time period. If appropriate documentary evidence is no longer available, Labor may obtain explanatory statements from Company officials. If plaintiffs produce contradictory evidence, such explanatory Company statements may be relied on to deny eligibility only if the Secretary produces the author of the statement at a hearing. The conduct of such hearing and the reasons for these specific instructions are discussed, *infra,* at 1094–95.

### C. *Korean Relay Frames.*

■ Plaintiffs allege that importation of relay frames, which had been a high volume item of production at the Swissvale plant and had occupied a high percentage of the effort of the plant's machine shop, contributed significantly to worker separation at Unit Shop III and the machine shop. Labor, however, found that the Company purchased relay frames domestically, which were machined at Swissvale, and that it did not start importing significant numbers of pre-machined Korean relay frames until May, 1987, which Labor contends is outside the proper time frame for investigation. Much of the dispute revolves around a purchase order, dated March 17, 1986, in which the Company requested delivery of relay frames from a Korean producer. B–537–39.

The Company requested that the first and smallest order be delivered on May 15, 1986. The rest of the order was to be delivered at other times in 1986 and 1987. *Id.* The Secretary, however, found that this purchase order was never executed according to its terms. The Secretary based the finding on statements of Compa-

ny officers and import data compiled by a Company official. C–161–66. Plaintiffs, relying on affidavits of former Company officials, C–35–102, *see also* C–132, contend that shipments from Korea were received along the lines of the purchase order. This debate adds little to resolution of this matter, as the court will explain.

Noting that plaintiffs filed their petition for certification on January 17, 1986, defendant asserts that

> if the Secretary determines that the workers meet the three criteria outlined above, then only those workers who were separated from the firm ... within one year of the date of the petition may be certified as eligible to receive adjustment assistance. 19 U.S.C. § 2273(b)(1). Accordingly, the period of critical importance in this case runs from January 18, 1985 to January 17, 1986 ...

D. Brief at 6.

The portion 19 U.S.C. § 2273 (1988) cited by defendant reads:

> (b) A certification under this section shall not apply to any worker whose last total or partial separation from the firm or appropriate subdivision of the firm before his application under section 2291 of this title occurred—
>
> (1) more than one year before the date of the petition on which such certification was granted ...

Plaintiffs contend that defendant has misread the Act and claim that

> [t]he portion of the Act cited by the Defendant merely establishes the "impact date," which is the date one year before the petition is filed. Only workers laid off after the impact date are covered by the certification. However, section 231(a) of the Act, 19 U.S.C. § 2291(a)(1), provides that any worker laid off from a certified plant within a *three year period* that begins with the "impact date" is eligible for benefits. In

this case, then, Swissvale workers with separation dates between January 16, 1985 and January 16, 1988 are eligible.

P. Reply Brief at 16. Plaintiffs assert further that "[i]f as Defendant reasons, only workers not laid off before 1986 are eligible, then imports received after that date are not relevant. But as noted, the certification extends over a three period [sic] between 1985 and 1988." *Id.*

This court is unsure of plaintiffs' position on this issue, for they also complain that the information on sales provided by the Company to the Secretary "covers only 1987 and does not address how outsourcing affected Swissvale in 1984–1986, which is the important time frame under the Act." P. Brief at 26.[8]

Assuming that petitioners construe the statute to mandate a three year period for investigation and defendant contemplates a one-year eligibility period, the court finds that both plaintiffs and defendant misstate the meaning of the Act. The applicable portion of 19 U.S.C. § 2291 (1988) states:

> (a) **Trade readjustment allowance conditions.**
>
> Payment of a trade readjustment allowance shall be made to an adversely affected worker covered by a certification under subpart A of this part who files an application for such allowance for any week of unemployment which begins more than 60 days after the date on which the petition that resulted in such certification was filed under section 2271 of this title, if the following conditions are met:
>
> (1) Such worker's total or partial separation before his application under this part occurred—
>
> (A) on or after the date, as specified in the certification under which he is covered, on which total or partial separation began or threatened to begin in the adversely affected employment,

---

8. The answer, as far as the Secretary is concerned, as to relay frames, based on Company statements, is that imports of relay frames did not occur in 1984–86. C–196. Although there may be some reason to doubt these statements because of inaccuracies in other areas, plaintiffs' witnesses have not indicated that these products were imported earlier than mid–1986. Thus, given the extent of past investigations by all parties, the fact gathering aspect of this particular matter may be considered concluded.

(B) before the expiration of the 2–year period beginning on the date on which the determination under section 2273 of this title was made ...

Sections 2273 and 2291 are both found in part 2 of the Trade Act of 1974. However, section 2273 is within subpart A, entitled "Petitions and Determinations." Section 2291, on the other hand, is within subpart B, entitled "Program Benefits."

Clearly Congress intended that any workers laid off from a certified plant during the three year period which plaintiffs mention could apply for benefits. It does not follow, however, that the applicable time period for investigation is the entire three years. Only subpart A is relevant for determining the proper time frame for investigation. 19 U.S.C. § 2273(a) states:

As soon as possible after the date on which a petition is filed under section 2271 of this title, *but in any event not later than 60 days after that date*, the Secretary shall determine whether the petitioning group meets the requirements of section 2272 of this title and shall issue a certification of eligibility to apply for assistance under the part covering workers in any group which meets [such] requirements ... (emphasis added).

Had this investigation not been mired in error and dispute, the Secretary's final determination would have issued before Korean relay frames had even been ordered. Therefore it is, for the most part, irrelevant when the orders were actually delivered. Surely Congress did not intend to require the Secretary to investigate periods occurring well after his determination is due. The fact that litigation ensued does not extend the relevant time frame to the entire three-year eligibility period. Therefore, the court finds that Labor's negative determination regarding importation of Korean relay frames is supported by substantial evidence in the record.

II. *The Adequacy of Procedures Afforded Petitioners.*

Petitioners contend that the hearing conducted by defendant on April 16, 1987 should have been a trial-type proceeding held according to the standards outlined in the Administrative Procedures Act (APA), 5 U.S.C. §§ 554–557 (1988), with full rights of cross-examination. "Plaintiffs contend that the Department's reliance on evidence which is incomplete, inaccurate, and untested by cross-examination has resulted in a decision which is not based on substantial evidence, and that the failure of the Department of Labor to permit Plaintiffs to cross-examine company officials violated § [554] of the Administrative Procedure Act [and] their constitutional right to due process." P. Brief at 38. Having already dealt with the question of substantial evidence, the court turns to the two remaining questions: (1) did the Secretary violate plaintiffs' rights of due process under the Fifth Amendment of the United States Constitution by not allowing petitioners to cross-examine Company officials regarding evidence upon which Labor relied in reaching its negative determination; and (2) was the Secretary required by statute to conduct a trial-type hearing under the APA guidelines?

A. *Constitutional Due Process.*

Noting that petitioners are applicants for benefits, rather than recipients, defendant argues that "it is very doubtful whether the union's claim to adjustment assistance benefits rises to the level of a property interest protected by the fifth amendment." D. Brief at 34–35 n. 16. The Supreme Court has not yet resolved the question of whether applicants for benefits, as opposed to those already receiving them, have an interest entitled to protection under the Fifth Amendment of the Constitution. *See Lyng v. Payne*, 476 U.S. 926, 942, 106 S.Ct. 2333, 2343, 90 L.Ed.2d 921 (1986). Furthermore, although this matter has investigative aspects, the cases of *Hannah v. Larche*, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960) and *Pasco Terminals v. United States*, 83 Cust.Ct. 65, 477 F.Supp. 201 (1979), *aff'd* and *adopted*, 68 CCPA 8, 624 F.2d 610 (1980) (no right to cross-examine during Tariff Commission Antidumping investigation) are both distin-

guishable from this case.[9] The court would note the case of *Former Employees of Bass Enterprises Production Company v. United States*, 12 CIT ——, 688 F.Supp. 625, 629 (1988) (as a matter of due process, Labor should provide *pro se* petitioners with actual notice of the 10–day period in which to request a hearing, *citing, inter alia, Miller v. Donovan*, 9 CIT 473, 476–79, 620 F.Supp. 712, 716–17 (1985), and *Estate of Finkel v. Donovan*, 9 CIT 374, 378–79, 614 F.Supp. 1245, 1246–49 (1985)).

Rather than attempting to resolve at the outset the thorny questions of how significant a difference there is between deprivation of benefits before or after their initial receipt, or whether this matter may be labeled purely investigatory, the better approach to the type of question raised here may be to weigh at the outset the three factors for determining whether the process afforded is adequate, as outlined in *Mathews v. Eldridge*, 424 U.S. 319, 334–335, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976). Therefore the court will assume, for the sake of argument, that plaintiffs are entitled to some level of due process.

The first *Mathews* factor is "the private interest that will be affected by the official action." 424 U.S. at 335, 96 S.Ct. at 903. Plaintiffs' interest does not rise to the level of that of the welfare recipient in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), who likely had no other resources available. Rather, like the social security recipient in *Mathews*, the applicants may have access to other resources or may have found other employment. It is also appropriate to consider as part of this analysis that, because this dispute arises prior to receipt of benefits, there is no present expectation of their continuance. Finally, it should be remembered that the applicants are not individually seeking benefits; that is a separate process. What is at issue is an overall certification of group eligibility based on industry conditions. Thus, the interest involved here is a step removed from the interest at issue in *Mathews*. Therefore, although plaintiffs do have an interest in obtaining certification of eligibility for benefits, their position regarding this first factor is not particularly strong.

The second factor is "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." 424 U.S. at 335, 96 S.Ct. at 903. Here, plaintiffs' interest may be stronger. First, there is no opportunity for full fact-finding at any other stage. This is a distinguishing feature from both *Mathews* and *Goldberg* where a post-termination hearing was available. Second, that the Secretary has twice asked for a remand after determining that the investigations were flawed attests to the probable utility of further procedural safeguards. Defendant argues that plaintiffs' position as to the second factor is weak because, through the tortuous process of the past four years, plaintiffs have had ample opportunity to present their case. D. Brief at 38–39. This is not what Congress intended in enacting the Trade Act of 1974. Much of the Congressional frustration with the worker adjustment assistance provisions of the Trade Expansion Act of 1962 was due to the fact that

> [t]he petitioning process has proven to be cumbersome and time-consuming. Many recipients did not receive payments under the program until long after they became unemployed because of increased imports. Too often the assistance which they received came too late for it to have its maximum beneficial impact. In light of this experience, the Committee has provided a new adjustment assistance program with eased qualifying criteria and a streamlined petitioning process. It is the intention of the Committee that workers displaced by increased imports receive all the benefits to which they are entitled in an expeditious manner.

Report of the Senate Committee on Finance on the Trade Reform Act of 1974, S.Rep. No. 1298, 93rd Cong.2d Sess. 131, *reprinted in* 1974 U.S.CODE CONG. 7 ADMIN. NEWS 7186, 7273.

---

**9.** *Hannah* is discussed, *infra,* at 1091–92. In *Pasco* no benefits were finally denied.

Nonetheless, Labor has admitted past errors and there is insufficient evidence to conclude it is conducting this investigation in bad faith. Labor's duties are largely investigatory and a full trial-type hearing with cross-examination is not always the way to investigate properly. The court does not believe that cross-examination by plaintiffs is necessary to insure proper fact-finding in the situation at hand. What exactly is necessary in this particular case because of past flawed investigations is discussed, *infra*, at 1094–95.

The third factor, "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail," 424 U.S. at 335, 96 S.Ct. at 903, weighs more strongly in the government's favor. If trial-type proceedings were required upon demand it is likely that Labor would have to subpoena company officials in many cases. The enforcement of the subpoenas in a district court would take additional time, as would cross-examination. The hearing would thus include many more persons, or more agency work hours, than at present. Labor would be hard-pressed to complete its investigation within a reasonable time, which may be judged in light of the 60 days allotted by Congress. 19 U.S.C. § 2273(a).

Plaintiffs claim that the overall cost increase to Labor would be small because, according to plaintiffs, only five hearings have ever been held under the program although thousands of petitions have been filed. P. Reply Brief at 38. It stands to reason, however, that if petitioners for benefits are assured that they may cross-examine, at a requested hearing, those who present evidence counter to the workers' claims, and would necessarily forfeit that right by not requesting a hearing, then many petitioners would invoke 19 U.S.C. § 2271(b) and Labor's costs and burdens would rise accordingly. Expeditious performance of the duties required by Congress requires some streamlining.

Therefore, after weighing the three *Mathews* factors, the court concludes that, assuming it is applicable to the type of adjudication/investigation at issue, the Fifth Amendment of the Constitution does not require that plaintiffs be afforded a trial-type hearing with full rights of cross-examination.

B. *Applicability of the APA.*

■ 5 U.S.C. § 554(a) (1988) "applies, according to the provisions thereof, in every case of adjudication required by statute *to be determined on the record* after opportunity for an agency hearing" (emphasis added). Plaintiffs contend that the APA applies to hearings conducted by the Secretary under 19 U.S.C. § 2271(b), and that therefore the Secretary may rely upon no other evidence than that compiled on the record at such a hearing, if one is requested.

Under 5 U.S.C. § 551 (1988):

(6) "order" means the whole or a part of a *final disposition,* whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing; (emphasis added)

(7) "adjudication" means agency process for the formulation of an order.

Defendant does not contest "that Labor's final adjustment assistance determination is a final disposition of the case." D. Brief at 43 n. 23. Therefore, the certification investigation results in an order under the definitional scheme of the APA. Nevertheless, relying on *Hannah v. Larche,* 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960), defendant claims that it is not engaged in adjudication. In that case, the Supreme Court upheld the validity of rules promulgated by the Commission on Civil Rights under which persons accused of discrimination could be denied the right to be apprised of the specific charges against them or to know and cross-examine their accusers. The Supreme Court found that the Commission did not adjudicate because, *inter alia,* it did not issue orders. *Id.* at 441, 80 S.Ct. at 1514. Rather, the Commission's purpose was to appraise the federal laws regarding equal protection and to report its findings to the President and the Congress. *Id.* at 440 n. 17, 80 S.Ct. at 1514 n. 17 (*quoting* 42 U.S.C. § 1975c (1957)).

As noted above, Trade Readjustment Assistance investigations culminate in orders under 19 U.S.C. § 2273. Therefore, the Secretary does conduct an "adjudication" under the definition found in 5 U.S.C. § 551(7).

The court must still determine, however, whether the Secretary is engaged in an "adjudication required by statute to be determined on the record after opportunity for an agency hearing ..." *Id.* Defendant concedes that "the statutory framework provides for the opportunity for an agency hearing, if requested. 19 U.S.C. § 2271(b)." D. Brief at 44.

> Under 19 U.S.C. § 2271(b),
>
> [i]f the petitioner, or any other person found by the Secretary to have a substantial interest in the proceedings, submits not later than 10 days after the date of the Secretary's publication under subsection (a) of this section a request for a hearing, the Secretary shall provide for a public hearing and afford such interested persons an opportunity to be present, to produce evidence, and to be heard.

Generally, statutes mandating determinations to be made on the record after opportunity for a hearing are explicit.[10] As plaintiffs concede, "§ 2271(b) does not specifically contain the phrase 'on the record'." P. Brief at 39. Defendant claims that "[t]his fact alone is sufficient to render the APA inapplicable." D. Brief at 44. This court cannot agree. Defendant relies on *United States v. Allegheny–Ludlum Steel,* 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972). In that case, the Supreme Court held that "[t]he Esch [Car Service] Act [of 1917], authorizing the [Interstate Commerce] Commission 'after hearing, on a complaint or upon its own initiative without complaint, [to] establish reasonable rules, regulations, and practices with respect to car service ...,' does not require that such rules 'be made on the record.' " *Id.* at 757, 92 S.Ct. at 1950. The Supreme Court, however, went on to say that "[w]e do not suggest that only the precise words 'on the

record' in the applicable statute will suffice to make §§ 556 and 557 applicable to rulemaking proceedings ...." *Id.* Defendant's reliance on *Allegheny–Ludlum* is further misplaced "[b]ecause the proceedings under review were an exercise of legislative rulemaking power rather than adjudicatory hearings ...." *Id.*

This court agrees with plaintiffs that the phrase "on the record" need not necessarily be included in the statute to invoke the APA. If the applicability of the APA is not explicit in the statute, however, the court must look carefully into the history and context of the legislation to determine whether the APA applies.

Plaintiffs rely on *Steadman v. SEC,* 450 U.S. 91, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981). In that case, petitioner had been accused of violating anti-fraud provisions of the federal securities laws under 15 U.S.C. §§ 80a–9(b) and 80b–3(f), *id.* at 92–93, 101 S.Ct. at 1003, and had received a trial-type hearing by the SEC. The Supreme Court noted that "[t]he phrase 'on the record' appears in § 80b–3(f), and while it does not appear in § 80a–9(b), ..., the absence of the specific phrase from § 80a–9(b) does not make the instant proceeding not subject to § 554" (citations omitted). *Id.* at 96–97 n. 13, 101 S.Ct. at 1005 n. 13. The Court reasoned, *inter alia,* that

> the substantive violations to be proved pursuant to §§ 80a–9(b)(1)–(3) are virtually identical to the substantive violations stated in §§ 80b–3(e)(1), (4), and (5), which are incorporated by reference into § 80b–3(f). The only substantive difference between § 80b–3(f) and § 80a–9(b) is that the former permits the Commission to impose sanctions on persons affiliated with an investment advisor and the latter on persons affiliated with an investment company. In both statutes, the Commission is required to prove violations of the securities law provisions enumerated, precisely the type of proceeding

---

10. *See, e.g.,* Section 337 of the Tariff Act of 1930 which states that "[e]ach determination under subsections (d) or (e) of this section shall be made on the record after notice and opportunity for a hearing in conformity with the provisions of subchapter II of Chapter 5 of Title 5." *19 U.S.C. § 1337(c) (1988).*

for which the APA's adjudicatory procedures were intended (citation omitted).

*Id.*

Similarly, it is incumbent on this court to examine 19 U.S.C. § 2271(b) in context. The Trade Act of 1974 contains provisions for adjustment assistance to firms and communities which are similar to those for workers.[11] 19 U.S.C. § 2271(b) is mirrored by § 2341(b) regarding firms and § 2371(b) regarding communities. Like the Secretary of Labor, the Secretary of Commerce issues final determinations through adjudication under the definition in 5 U.S.C. § 551(7). Judicial review of eligibility decisions regarding workers, firms, and communities is available under 19 U.S.C. § 2395. Yet the Secretary of Commerce should not be deemed to be adjudicating solely "on the record" of the requested hearing under APA guidelines because Congress did not grant him subpoena power for these investigations. Congress did, however, grant subpoena power to the Secretary of Labor. 19 U.S.C. § 2321. A review of the legislative history of the Trade Act of 1974 indicates that Congress granted subpoena power as a result of its frustration over the small number of workers certified under the Trade Expansion Act of 1962. *See* Report of the Senate Committee on Finance on the Trade Reform Act of 1974, S.Rep. No. 1298, 93rd Cong.2d Sess. 131 & 140 (1974), *reprinted in* 1974 U.S.CODE CONG. & ADMIN. NEWS 7186, 7273 & 7282. Apparently, Congress wished to improve Labor's investigative tools.

Moreover, it seems that Congress purposely left the phrase "on the record" out of 19 U.S.C. § 2271(b). The Senate Report goes on to say that

> [i]t is intended that ... the Secretary of Labor ... shall be given flexibility in making determinations of eligibility while at the same time making every effort to preserve as nearly as possible uniformity in the interpretation of eligibility standards.

S.Rep. No. 1298 at 153, 1974 U.S.CODE CONG. & ADMIN.NEWS at 7292.

The Senate Report also states in regard to firm investigation that

> [g]enerally, it is intended that the criteria of eligibility for firms should be interpreted as nearly as possible in conformity with the definitions set forth in the worker adjustment assistance sections of this report.

S.Rep. No. 1298 at 145, 1974 U.S.CODE CONG. & ADMIN.NEWS at 7286. This statement is made in spite of the fact that for firm investigations the Secretary of Commerce was not given the subpoena power granted to the Secretary of Labor in worker adjustment assistance investigations. *See* 19 U.S.C. § 2321. Congress apparently intended that the Secretaries of Labor and Commerce conduct their investigations in a similar manner. Overall, there is nothing in the legislative history indicating that Congress intended hearings conducted by virtue of 19 U.S.C. 2271(b) to be held under the standards of the APA.

Plaintiffs argue that "given the requirement that the record must be filed with the court in the event of judicial review, there can be little doubt that Congress intended any hearing to be conducted on the record." P. Brief at 39 (*citing* 19 U.S.C. § 2395(a)). Requiring the Secretary to hand over its administrative record, however, is a far cry from saying that if a hearing is requested, the entire record supporting the determination must consist of evidence compiled at the hearing after opportunity for cross-examination. Rather, the certification investigation is of an *ex parte* nature. *See Miller v. Donovan,* 9 CIT 473, 477–78, 620 F.Supp. 712, 717 (1985). Furthermore, this court has held that although *pro se* petitioners should be given actual notice of their right to a hearing, failure to give such notice is not reversible error provided that "the administrative record is replete with materials submitted by plaintiff" who "has not demonstrated any additional materials that he

---

**11.** The Secretary of Commerce, rather than the Secretary of Labor, makes eligibility determinations for firms and communities.

would have presented at a public hearing that would have been helpful to his case." *Id.* The court would not have so held if the statute required that, in the event a petitioner requests a hearing, he has the right to a full trial-type proceeding. The court's holding in *Miller* recognized that the hearing is merely one ingredient in an investigation, and is but one part of the record to be reviewed by the court.

Therefore, the court finds nothing in the language, context, or legislative history of 19 U.S.C. § 2271(b) indicating Congressional intent that the existence of a hearing request mandates that the Secretary's determination must be made solely on the record of the hearing after full opportunity for cross-examination.

### C. *Procedures Required in this Case.*

■ Quite apart from Constitutional requirements or the APA, it is clear that Congress intended that petitioners for certification be afforded fair hearing and that they be given full opportunity to present their case. Labor's previous investigations obviously have been inadequate, as the Secretary has recognized. Labor has continued to accept Company statements at face value despite the fact that information which it supplied previously has been false and misleading. *United Elec., supra,* 11 CIT at 593, 596, 669 F.Supp. at 469, 471. It appears that the "hearing" previously held was not a valid attempt to find the truth of the matters asserted in the Company statements. In fact, given the post-hearing search for more Company statements, the hearing became an illusory right and certainly not the complete examination the court apparently intended. At this late date there must now be yet another remand, the results of which must be submitted to this court. At least in regards to this case, Congressional intent has been frustrated because a *prompt* just result

has not been obtained. As mentioned previously, much of the Congressional frustration with the worker adjustment assistance provisions of the Trade Expansion Act of 1962 was due to the fact that the application process was slow and cumbersome. *See* S.Rep. No. 1298 at 131, 1974 U.S.CODE CONG. & ADMIN.NEWS at 7273.

Litigation must end sometime. Although trial type proceedings with cross-examination might in the usual case be unduly cumbersome and not within the intent of Congress with regard to initial investigations, in this case procedures of that type may actually speed resolution as well as achieve a just result under the statute. The court does not act on a clean slate. It must find a way to best fulfill Congressional intent and to provide an equitable result, now that there has already been failure to meet the statute on more than one occasion.[12] While Labor, as a general rule, should not be prevented from relying on reasonably reliable hearsay, in this case Labor may no longer rely on fairly disputed statements of Company officials, unless the authors of the statements are present at a hearing so that Labor may cross-examine them, or unless plaintiffs waive the opportunity to request their presence. The court does not believe that in order to satisfy the statute Labor *must* allow plaintiffs to cross-examine Company officials in this case, although Labor may do so. *See also supra,* Section II A & B.

Therefore, Labor shall conduct its *ex parte* investigation as the court has instructed in parts IA and B. All evidence gathered is to be made available to plaintiffs under protective order. Plaintiffs may comment to Labor on the evidence. If plaintiffs have produced evidence contradicting statements of Company officials, but Labor considers the Company state-

---

12. On Feb. 1, 1990, a telephone conference call was held between the court, plaintiffs, and defendant. The court gave Labor ten days to propose a detailed plan for completion of this investigation including ways to resolve various issues of credibility. In a letter dated Feb. 12, 1990, Labor said that it does not consider itself to be "in a position to propose a detailed plan for remand." The court finds Labor's response

troubling because the Secretary asked that this case be remanded, at least in part. The court is puzzled as to how a decision was made by the agency as to the inadequacy of its investigation and the need for remand without a plan for action following remand. Labor's response leaves the court no choice but to devise a plan of its own.

ments to support denial of eligibility, Labor shall subpoena the relevant Company official to testify at a hearing at which Labor may examine the officials. Plaintiffs shall be permitted an opportunity to submit additional questions to Labor. If Labor finds such questions helpful to testing credibility, or to be generally helpful to the investigation, it shall propound any such question or permit plaintiffs' counsel to do so.[13] After the hearing, no further statements of Company officials may be obtained by Labor. If necessary, further source documentation may be obtained, but if it is, plaintiffs must be given an opportunity to comment on the new documentation.

The court believes that the long history in this particular case, including false and misleading information, errors, lack of fair hearing and inadequate investigation on the part of Labor, requires that the choice of investigative technique can no longer be left entirely to Labor's discretion in this case. The court also finds that it is likely that this case will require further remands unless specific procedures for investigation of this nature are directed.

As indicated, the court does not believe that all hearsay evidence must be excluded. As discussed, *supra*, nothing in the statute or the legislative history leads this court to believe that Congress did not intend for the Secretary to compile as complete a record as possible given the time constraints involved. Trade Readjustment Assistance investigations are not *ordinarily* adversarial and are best conducted by questioning a wide range of individuals, *e.g.*, customers.[14] In the usual case Congressional intent would not be served by limiting evidence to that given by those produced at a hearing.

Finally, the court notes that Labor has continued to rely on questionnaires sent to customers of the Company, C–190, notwithstanding evidence in the record that imported merchandise was repackaged and relogoed to look like domestically produced merchandise. C–65–67. Labor shall not use such questionnaires to support a conclusion of lack of purchase of imports by customers of the Company unless it develops evidence that indicates the questionnaires provide some valuable data in this regard. Such evidence is not now in the record. And, as indicated, Labor may not rely on fairly disputed statements by Company officials without following the procedures previously outlined.

## CONCLUSIONS

Labor's request that the court remand to it the question of the effect of importation of Canadian office control panels is granted. The court finds that even assuming that process was adequate, the Secretary's determination that importation of Italian train stop kits did not contribute importantly to worker separation at the Swissvale plant was not supported by substantial evidence. The court upholds Labor's finding regarding Korean relay frames.

While the court agrees with the Secretary that Congress did not intend generally that public hearings held by virtue of 19 U.S.C. § 2271(b) conform to APA standards, and that the Fifth Amendment of the Constitution does not require that plaintiffs be afforded the opportunity to cross-examine Company officials, the history of this investigation leads the court to conclude that if Labor finds statements of Company officials supportive of denial of eligibility and such statements are disputed, a hearing must be scheduled at which Labor shall examine such Company officials.

It is therefore:

ORDERED that prior to any hearing Labor shall obtain reliable documentary evidence as to whether production, or merely assembly, of train stop kits was transferred to the Company's Georgia plant; it is further

ORDERED that prior to any hearing Labor shall obtain reliable documentary evidence as to how the Italian train stop kit

---

**13.** Provisions for confidentiality of trade or proprietary data should be made.

**14.** Customer surveys, however, do not answer all relevant questions, particularly when relogoing is an issue, as indicated in the text.

orders affected production at Swissvale; it is further

ORDERED that prior to any hearing Labor shall obtain the bill of materials and route sheets, as well as applicable "move tickets," for office panels of the type formerly produced at Swissvale and subsequently imported from Canada, along with reliable documentary evidence as to how many such panels were produced per year at Swissvale; it is further

ORDERED that prior to any hearing plaintiffs shall have the opportunity to examine all evidence gathered by Labor; it is further

ORDERED that all Company officials whose statements Labor finds supportive of denial of eligibility and whose statements are disputed shall be present at a hearing so that Labor may examine them; it is further

ORDERED that, plaintiffs shall be given an opportunity to suggest additional questions for examination to Labor; it is further

ORDERED that the Department of Labor shall conduct no further investigation after the conclusion of the hearing except the gathering of source documentation if needed; it is further

ORDERED that the Department of Labor shall follow all other directions contained herein, but that it may conduct further investigation not ordered as long as such investigative techniques do not conflict with this opinion; and it is further

ORDERED that the Department of Labor shall submit its results on remand to this court within sixty days of the date of this action.