FORMER EMPLOYEES OF BELL HELICOPTER TEXTRON, PLAINTIFFS *v.*
UNITED STATES, DEFENDANT

Court No. 93–01–00024

(Dated April 29, 1994)

*Saul L. Sherman, Esq.,* for plaintiffs.
*Frank W. Hunger,* Assistant Attorney General; *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice *(Cynthia B. Schultz)* for plaintiff.

## OPINION

MUSGRAVE, *Judge:* Plaintiffs, former employees of Bell Helicopter Textron ("Bell Helicopter") move this Court for judgment upon the agency record pursuant to United States Court of International Trade Rule ("USCITR") 56.1. Plaintiffs contend the Department of Labor's ("Labor") negative determination of eligibility for certification for trade adjustment assistance benefits is not supported by substantial evidence on the record and is not otherwise in accordance with law under the Trade Act of 1974 as amended. 19 U.S.C. § 2272 (1988).

## DISCUSSION

A negative determination by the Secretary of Labor denying certification of eligibility for trade adjustment assistance will be upheld if it is supported by substantial evidence on the record and is otherwise in accordance with law. 19 U.S.C. § 2395 (1988); *See Woodrum v. Donovan,* 5 CIT 191, 193, 564 F. Supp. 826, 828(1983), *aff'd, sub nom. Woodrum v. United States,* 2 Fed. Cir. (T) 82, 737 F.2d 1575 (1984). The findings of fact by the Secretary are conclusive if supported by substantial evidence. 19 U.S.C. § 2395(b). Substantial evidence has been held to be more than a "mere scintilla," and must be reasonable enough to support a conclusion. *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986) (and cases cited therein), *aff'd,* 5 Fed. Cir. (T) 77, 810 F.2d 1137 (1987). Additionally, "the rulings made on the basis of those findings [must] be in accordance with the statute and not be arbitrary and capricious, and for this purpose the law requires a showing of reasoned analysis." *International Union v. Marshall,* 584 F.2d 390, 396 n.26 (D.C. Cir. 1978).

This Court has also observed that "because of the *ex parte* nature of the certification process, and the remedial purpose of the trade adjustment assistance program, the Secretary is obligated to conduct his investigation with the utmost regard for the interests of the petitioning workers." *Stidham v. Dep't of Labor,* 11 CIT 548, 551, 669 F. Supp. 432, 435 (1987), *citing Abbott v. Donovan,* 7 CIT 323, 327–28, 588 F. Supp. 1438, 1442 (1984). Furthermore,

> A reviewing court may remand a case and order the secretary to further investigate if "good cause [is] shown." 19 U.S.C. § 2395(b).

"Good cause" exists if the Secretary's chosen methodology is "so marred that [his] finding is arbitrary or of such a nature that it could not be based on 'substantial evidence.'" *United Glass & Ceramic Workers of North America, AFL-CIO v. Marshall,* 584 F.2d 398, 405 (D.C. Dist. 1978); *see Cherlin v. Donovan,* 7 CIT 158, 162, 585 F. Supp. 644, 647 (1984) (other citations omitted).

Trade adjustment assistance is available to workers separated from employment when the Secretary of Labor determines, *inter alia,*

(a) * * *

(2) that sales or production, or both, of such firm or subdivision have decreased absolutely, and

(3) that increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation, or threat thereof, and to such decline in sales or production.

(b) For purposes of subsection (a)(3) of this section—

(1) The term "contributed importantly" means a cause which is important but not necessarily more important than any other cause.

19 §§ 2272(a)-(b)(1). Plaintiffs assert that increases of imports under subsection (a)(3) were the cause of their separation. They seek remand with instructions to labor to conduct a proper investigation into the relationship between the termination of appellant's employment and the shift of Bell's helicopter production from Fort Worth to Canada.

Plaintiffs were employees of Bell Helicopter of Fort Worth, Texas, a wholly owned subsidiary of Textron, Inc., which was principally engaged in the manufacture of helicopters. Plaintiffs were discharged on June 16, 1992, along with two other writers/illustrators in the Technical Publications group at Bell Helicopter. A petition, dated August 11, 1992, was filed with Labor on October 26, 1992 by a local of the United Auto Workers seeking trade adjustment assistance for these workers. The essential allegations of the Petition are as follows:

"Technical publications department produces manuals to support Bell Helicopter products world-wide * * *. On approximately 06/16/92 management notified the workers that work would cease on commercial work orders the following Friday and that all writing efforts would be boxed up. It appears that work is being exported to Bell Helicopter Canada and Canadair Publications.

"Bell Helicopter is increasingly appearing to be exporting jobs to Canada in order to take advantage of lower wages, benefit packages, and Government subsities *[sic]* on new design projects *[sic]*. The manuals produced in Canada will replace the Fort Worth produced manuals worldwide."

*Administrative Record (A.R.) Doc. No. 2.*

Labor's negative determination rejecting plaintiffs' request for assistance certification focused on a finding that the location of helicopter production was unimportant because the manuals were nonetheless

being produced in Forth Worth. *Defendant's Memorandum in Opposition to Plaintiffs' Rule 56.1 Motion for Judgment Upon the Agency Record* at 2–4. Corollary to that finding was Labor's finding, reflected in the record, that no manuals were being imported at the time of the investigation. *A.R. Doc. No. 14, Final Determination of Labor* (rejecting plaintiffs' request for reconsideration). With no showing of imports on record, plaintiffs were unable to satisfy subsection 2272(a)(3) of Title 19, and the Department of Labor held that they did not qualify for certification.

Plaintiffs claim that Labor's conclusions were unjustified and unsubstantiated in the administrative record. Plaintiffs' observe that there is no mention anywhere in the investigative portion of the record—outside of plaintiffs' assertions—that helicopter production had been moved to Canada. There was no investigation of this assertion or plaintiffs' assertion that manual writing is tied closely to the location of production of the helicopters.

The government responds that by plaintiff's own admission, manual production is "ancillary" to helicopter production (which plaintiff alleges should have been investigated) and the Court has held that an ancillary product is not "like or directly competitive with" a finished product, whose sales or production may have been adversely affected by foreign imports. *See* 19 U.S.C. § 2272 (a)(3); *Defendant's Memorandum for Judgment upon the Agency Record* at 8. Plaintiffs' unfortunate choice of words does not change the thrust of the employees' arguments or the appropriateness of their legal claims. As Labor's January 19, 1993, letter makes clear, the subject of the investigation is and always was "user manuals, overhaul manuals, parts catalogs and general maintenance procedure manuals." *See Letter of Labor to Judy Anderson* (January 19, 1993), A.R. Doc. No. 14. Labor's finding that Bell Helicopter does not import the *manuals* produced in Forth Worth was determinative.

Plaintiffs' intended to point out, by use of the term "ancillary," merely that where the helicopter production goes, the manual production follows. Returning to the gravamen of plaintiffs' complaint about the inadequacy of Labor's investigation, if plaintiffs' contention is true, Labor cannot accurately assess where the manuals are being produced if it does not investigate where the helicopters are being produced. If Labor cannot determine with certainty where the manuals are produced, it is poorly placed to conclude that they are not being imported. Defendant's ancillary product argument fails by Labor's own characterization of the investigation and the line of cases cited in support thereof are accordingly inapposite.

Plaintiff has not contended that the manuals are like or directly competitive with helicopters. Rather, plaintiffs assert that production of one is directly linked to the production of the other: where sales and production of the helicopter in the United States decline, so naturally will sales and production of the manuals that accompany the helicopter. Similarly,

where sales and production and importation from Canada of the identical helicopter increase, so will importations of the manuals.

Defendant counters that when Labor conducts an investigation, it solicits information from the company that formerly employed the petitioning workers because that company possesses all the data regarding imports, sales, and production necessary to determine whether the company's workers qualify for certification. Defendant argues that this Court has held that unverified statements from company officials in a position to know about their company's products and business decisions constitute substantial evidence. *Defendant's Memorandum for Judgment upon the Agency Record* at 12, *citing United Steel Workers of America, Local 1082 v. McLaughlin,* 15 CIT 121, 122–23 (1991) ("Local 1082"). *Local 1082* relied in part on authority from the First Circuit. *See Local 167, Int'l Molders & Allied Workers' Union, AFL-CIO v. Marshall,* 643 F.2d 26, 31–32 (1st Cir. 1981) ("Local 167") (Secretary did not abuse his discretion by relying on unverified statements of company official).

Defendant's argument ignores that the Secretary's determination is made within the bounds of each particular case. In the authority noted above, both courts determined that there was no other evidence in the record to contradict or cast aspersion upon the statements of the company official. In contrast, in the case at bar, the company officials interviewed by Labor, Mr. Williams and Mr. Kelly, had serious adverse interests to acknowledging or confirming that the job losses were due to the fact that Bell Helicopter could pay Canadians less than Americans to build the helicopters and write the manuals in Canada, and that Bell Helicopter intended to do just that.

The public relations implications alone were enough to cast a cloak of suspicion over Bell Helicopter's responses, both in terms of veracity and completeness. Unlike *Local 167,* where the Secretary did not abuse his discretion for relying on the opinion of the company that production would be replaced by domestic sourcing in the absence of other evidence, Bell Helicopter was in the unique position of knowing in fact whether it was moving its production facility to Canada and had reason not to offer that information. The Secretary should have been sensitive to that possibility, in light of the allegations asserted by plaintiffs.

There is no evidence that Labor took any steps to verify the basic elements of plaintiffs' claim beyond accepting incomplete and unresponsive denials from Bell Helicopter officials regarding the existence of imports.[1] As plaintiffs correctly note, the record of the investigation

---

[1] The Court has previously remanded inadequate labor determinations based merely on a telephone conversation with a company employee and the company's answers to a short questionnaire. *Former Employees of General Electric Corp. v. U.S. Dept. of Labor,* 14 CIT 608 (1990).

speaks of the company at many points as though neither it nor its sister company in Canada produced helicopters. For example:

*Investigative Guide (A.R. Doc. No. 3, at 4–6):*
2. *Product(s) and end use of the product(s):*
    *response:* Technical publications.
6. \* \* \* If the plant is part of a larger corporate entity, identify the parent company and other plants manufacturing the same products.
    *response:* NA

*Transmittal Memo to Director of Office (A.R. Doc. No. 10 at 23):*
II. *Findings of the Investigation*
    (1) The subject firm produces: *response:* technical manuals and catalogs.
    (2) Aggregate U.S. imports of like or directly competitive articles: *response:* Left blank.

The Court will not order the Secretary to secure the information sought by plaintiffs if it was outside the scope of the Secretary's obligations regarding the time frame of the investigation.

Assuming plaintiffs' assertions are true, the determinative issue in this case is whether plaintiffs are entitled to certification when their dismissal precedes the importations. The following scenarios illustrate plaintiffs' dilemma. If plaintiffs lost their jobs after increased importations of Bell Helicopters and accompanying manuals from Canada, they would have a strong case for certification. If they lost their jobs and production moved to Canada but the helicopters and manuals produced in Canada or elsewhere were not imported in increasing quantities to the United States, plaintiffs would have a weak case for certification. A close reading of subsection 2272(a)(3) indicates that the Trade Adjustment Assistance Act is designed to alleviate the hardship on American workers imposed by separation to which increased imports contribute importantly.

The irony of this case is that the separation apparently took place before the alleged importations. The question for the Court is whether 19 U.S.C. § 2272(a)(3) requires strict chronological obedience for certification, *i.e.*, importation before separation. On the facts alleged by plaintiff, the line between condition precedent and consequence is fine indeed. Defendant has not spoken to this issue because Labor relied on the company response that there were no importations whatever.

Nonetheless, defendant remarks that this Court has held that "[t]o qualify for benefits, the statute requires a causal nexus between increased import penetration and the workers' \* \* \* separation. A causal nexus exists where there is a direct and substantial relationship between increased imports and a decline in sales and production." *Former Employees of Johnson Controls, Inc. Automative Sys. Group v. United States,* Slip Op. 92–114 at 3 (July 17, 1992) (citations omitted) ("Johnson Controls"). This determination of law in *Johnson Controls* was directed at the unsuccessful argument that Labor should have

determined the impact of a finished product (automobiles) on the component part produced by plaintiff employees. The *Johnson Controls* Court relied equally on the finding that there were no importations of the subject component product. This information was garnered from company officials and was deemed satisfactory, apparently because there was no contradictory evidence in the case.

As discussed above, plaintiffs have sufficiently challenged Labor's decision to rely solely on the statements of the company officials by alleging that the production was shifted to Canada, where Bell Helicopter has existing facilities. The less the Secretary goes beyond the unsubstantiated oral statements of company officials, the less is required of plaintiffs to rebut those statements. The thoroughness of the Secretary's investigation is a factor that the Court may consider in determining whether the Secretary's decision is based on substantial evidence. If the Court determines that the statute permits consideration of events that take place after an employee's request for certification, the Court will impose on Labor a duty to make some attempt to verify allegations concerning those events.

Nowhere in the authority cited by defendant is specified chronological or sequential limitations on the Court's causal nexus analysis. If Bell Helicopter separated its manual producers in Forth Worth (along with other workers involved in the production of the line of helicopters in question) *so that* it could take advantage of higher profit margins by increasing imports from its Canadian facilities, the causal nexus is strong indeed. The Court is unable to discern this nexus based on the record before it because Labor did not pursue or attempt to verify that line of inquiry.

The premise of trade adjustment assistance, which has existed in some form since 1962, is to provide relief to workers displaced by the availability of more competitive importations. Congressman Oberstar described trade adjustment assistance as follows:

> In the early efforts of the Kennedy Round of negotiations on the General Agreement on Tariffs and Trade, which opened America's trade doors to the world, negotiators realized that there would be dislocation in the domestic economy as a result of reducing tariffs, quotas, and other trade barriers.
>
> In exchange, the consensus was that the workers and industries—principally, workers—should be helped to make adjustments to this dislocation; consequently, the 1974 Trade Adjustment Act was intensified to provide a wider array of benefits, and training, and relocations assistance to workers.

*Hearings Before the Subcommittee on Trade of the Committee on Ways and Means House of Representatives, Serial 99–30,* at 213 *(Statement of Hon. James L. Oberstar).* Similarly,

> Congress has recognized that unemployed victims of trade policies are different from other unemployed persons because their status is directly attributable to government trade policies. Congress

has stated the rationale for providing targeted benefits to the victims of federal trade programs:

'The program is premised upon the belief that trade-related unemployment and market disruption may differ somewhat in nature from that arising from other causes, and upon the belief that such trade-related imports, resulting from a federal policy of encouraging increased foreign trade for the benefit of the country should not be borne unaided by particular segments of U.S. industry and labor.'

*Id.* at 276 (Statement of J. Tomasi, Director, Region 2b, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW)), *citing Staff Data Materials relating to TAA Program prepared for use of Subcommittee on International Trade, Staff of Senate Committee on Finance* (96th Congress, 1st Session, 1979).

If plaintiffs' allegations are true, their predicament falls squarely within the purpose of that assistance.[2] This Court has visited the issue of the appropriateness of the scope of the time frame of Labor's investigation before. *See United Electrical, Radio and Machine Workers of America v. Brock,* 14 CIT 121, 127–130, 731 F. Supp. 1082,1087–89 (1990) ("Brock"). In *Brock,* plaintiffs filed their petition for certification on January 17, 1986. The company made a substantial order for competitive imports on May 15, 1986. In rejecting plaintiffs' claim that the Secretary should have considered that order's influence in their separation, the Court held that the Secretary will not, indeed may not, be accountable to consider importations of which the Secretary could not have had *knowledge* by the time the Secretary was obligated to make its determination, *i.e.,* sixty days. *See id.* at 130 ("Surely Congress did not intend to require the Secretary to investigate periods occurring well after his determination is due."). *But see Katunich v. Donovan,* 8 CIT 156, 594 F. Supp. 744 (1984) (holding that the Secretary's failure to comply with the statutory instruction that the determination be made within sixty days did not deprive him of jurisdiction because that language was directory, not mandatory).

Therefore, this Court has recognized that events transpiring up to the statutory limit for the determination may be relevant and appropriate for consideration—even if delivery is to occur after the period limit for the determination. Such reasoning is in consonance with the statute, which explicitly grants leave to employees *threatened* with separation to file for certification. The effectiveness of the transitional unemployment assistance provided by the Act would be severely curtailed if the

---

[2] Trade adjustment assistance began in 1962 and has survived various incarnations and amendments through the present.

workers were obligated to wait until they were separated and until the imports that caused their separation started rolling in.[3]

CONCLUSION

While it is true that the agency has considerable discretion in conducting its investigations, and this Court will defer to its choice of reasonable methodologies, Labor must base its determination upon sufficient evidence for a reasonable mind to concur in the result Here, Labor did not conduct a sufficiently thorough and searching investigation to fully assess plaintiffs' claims, especially when viewed in light of the remedial purpose of the statute.

This matter is remanded to Labor to investigate, by independent verification, whether the Secretary could have known about plans certain, formulated by Bell Helicopter, to move production abroad, and substitute importations for the product previously produced at Forth Worth, *viz.* the various helicopter manuals referred to throughout this opinion. If the Secretary finds that plaintiffs' allegations are based on substantial evidence, the determination of plaintiffs' eligibility, pursuant to section 2272(a)(3) must be revisited in conformity with this opinion.

---

[3] *But see Committee of Conference Report No. 99–453,* December 19, 1985 [To accompany H.R. 3128] (rejected by the House on Dec. 19, 1985), at 611–12 (Comprehensive Omnibus Budget Reconciliation Act of 1986); 131 Cong. Rec. H38234, H38299 (daily ed. Dec. 19, 1985); *see also,* 1986 U.S.C.C.A.N. at 626–27 (legis. Hist. to P.L. 99–272). The commentary contained in the writings contained in these documents, characterized the Act as providing relief for plant relocations overseas only if the import of the article produced by that firm or plant preceded its closing and move. An amendment in the same materials to rectify that perceived problem was withdrawn at conference committee without comment or counterproposal by the Senate. Since the bill that accompanied those historical materials was rejected, and the source of the commentary is unknown, the Court gives the characterization contained within little weight. In any event, such sequential discipline cannot be discerned from the statute itself, which focuses on the causal nexus, not the order of the closing and the increase of imports.