AMERICAN SPRING WIRE CORPORATION, Armco Inc., Bethlehem Steel Corporation, Florida Wire & Cable Company, and Shinko Wire America, Inc., Plaintiffs,

v.

UNITED STATES, Defendant,

Trefileries Et Cableries Chiers Chatillon Gorcy and Companhia Siderurgica Belgo-Mineira, Intervenors.

Nos. 82–10–01355, 83–1–00101, 83–3–00371 and 83–3–00455.

United States Court of International Trade.

July 11, 1984.

See also C.I.T., 578 F.Supp. 1405.

Stewart & Stewart, Washington, D.C. (Eugene L. Stewart, Terence P. Stewart, Paul W. Jameson, and Kathleen T. Weaver, Washington, D.C., on the briefs), for plaintiffs.

Michael H. Stein, Gen. Counsel, U.S. Intern. Trade Com'n; Michael P. Mabile, Asst. Gen. Counsel, U.S. Intern. Trade Com'n (Jack M. Simmons, III, Washington, D.C., on the brief), for defendant.

Fox, Glynn & Melamed, New York City (Raymond F. Steckel and Garry P. McCormack, New York City, on the brief), for intervenor Trefileries et Cableries Chiers Chatillon Gorcy.

Wald, Harkrader & Ross, Washington, D.C. (Christopher Dunn and William J. Clinton, Washington, D.C., on the briefs), for intervenor Companhia Siderurgica Belgo-Mineira.

MALETZ, Senior Judge:

Plaintiffs in this consolidated action represent the domestic prestressed concrete steel wire strand (PC strand) industry.[1] By motion for judgment upon the agency record, they challenge as unsupported by substantial evidence and otherwise not in accordance with the law four final negative injury determinations by the United States International Trade Commission (ITC or Commission) involving imports of PC strand from Spain, France, the United Kingdom, and Brazil. *See* USITC Pubs. 1281 (Aug. 1982) (Spain); 1325 (Dec. 1982) (France); 1343 (Feb. 1983) (United Kingdom); 1358 (Mar. 1983) (Brazil).[2]

These ITC negative injury determinations followed affirmative findings by the International Trade Administration of the Department of Commerce (ITA) that PC strand imports from Spain, France and Brazil were being subsidized, while such imports from the United Kingdom were being sold at less than fair value. *See* 47 Fed.Reg. 28,723 (1982) (Spain); 47 Fed.Reg. 47,031 (1982) (France); 48 Fed.Reg. 4516 (1983) (Brazil); 47 Fed.Reg. 56,690 (1982) (United Kingdom).

Complaints were timely filed for each of the four ITC determinations. In view of the commonality of issues among the four cases, the actions were consolidated. For the reasons that follow, the court concludes

1. Intervenor Trefileries et Cableries Chiers Chatillon Gorcy is a French producer of PC strand. Intervenor Companhia Siderurgica Belgo-Mineira is a Brazilian producer of PC strand. PC strand is a product consisting of one center wire and six helically placed outer wires that is used in prestressing concrete.

2. Citations here and hereafter are to the official ITC publications, because *Federal Register* reprints of ITC determinations are generally incomplete.

that there is substantial evidence in the administrative record supporting the ITC's negative injury determinations and these determinations are accordingly sustained.

## I. Substantial Evidence

■ Under the statute, a final negative injury determination by the ITC must be sustained unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1982). "[S]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951), *quoted in Penntech Papers, Inc. v. NLRB*, 706 F.2d 18, 22 (1st Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983). *Accord Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). Taking into account " 'whatever in the record fairly detracts' from the [agency's] fact finding as well as evidence that supports it," *Penntech, supra,* 706 F.2d at 22 (quoting *Universal Camera, supra,* 340 U.S. at 487–88, 71 S.Ct. at 464–65), "[t]he court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo....* ' " *Id.* at 22–23 (quoting *Universal Camera, supra,* 340 U.S. at 488, 71 S.Ct. at 465).

The standard of review is identical when this court reviews determinations by the ITC:

The negative determination by the Commission's majority must be sustained if its findings and conclusions have a rational connection to its determination, and are supported by substantial evidence. Fundamentally, in reviewing an injury determination under the Anti-

dumping Act, this Court may not weigh the evidence concerning specific factual findings, nor may the Court substitute its judgment for that of the Commission. *Sprague Elec. Co. v. United States,* 2 CIT 302, 310–11, 529 F.Supp. 676, 682–83 (1981).[3] *Accord Pasco Terminals, Inc. v. United States,* 68 CCPA 8, C.A.D. 1256, 634 F.2d 610 (1980); *Budd Co. Ry. Div. v. United States,* 1 CIT 67, 507 F.Supp. 997 (1980).

## II. Material Injury

[2, 3] In its final antidumping and countervailing duty investigations, the ITC is required to determine whether:

(A) an industry in the United States—
(i) is materially injured, or
(ii) is threatened with material injury, or
(B) the establishment of an industry in the United States is materially retarded,

by reason of imports of the merchandise with respect to which the administering authority [ITA] has made an affirmative determination....

19 U.S.C. §§ 1671d(b)(1) and 1673d(b)(1) (1982).[4] The Commission must make an affirmative finding only when it finds *both* (1) present material injury (or threat to or retardation of the establishment of an industry) *and* (2) that the material injury is "by reason of" the subject imports. Relief may not be granted when the domestic industry is suffering material injury but not by reason of unfairly traded imports. Nor may relief be granted when there is no material injury, regardless of the presence of dumped or subsidized imports of the product under investigation. In the latter circumstance, the presence of dumped or subsidized imports is irrelevant, because only one of the two necessary criteria has been met, and any analysis of causation of injury would thus be superfluous.

■ "Material injury" has been defined by Congress as "harm which is not inconse-

---

**3.** The *Sprague* standard is equally applicable to countervailing duty cases.

**4.** The issue of material retardation of the establishment of an industry in the United States is not before the court.

quential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A) (1982). Congress has directed the ITC to consider "all relevant economic factors which have a bearing on the state of the industry," *id.* § 1677(7)(C)(iii), including, but not limited to:

>    (I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

>    (II) factors affecting domestic prices, and

>    (III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment.

*Id.*

The list is illustrative, but not exclusive. The flexibility afforded to the ITC is evinced by the legislative history. *See* H.R. Rep. 317, 96th Cong., 1st Sess. 46 (1979) ("The significance of the various factors affecting an industry will depend upon the facts of each particular case. Neither the presence nor the absence of any factor listed in the bill can necessarily give decisive guidance with respect to an injury determination.") *Cf.* S.Rep. 249, 96th Cong., 1st Sess. 88, *reprinted in* 1979 U.S. Code Cong. & Ad.News 381, 474 ("[T]he significance to be assigned to a particular factor is for the ITC to decide."). No factor, standing alone, triggers a *per se* rule of material injury. *See SCM Corp. v. United States,* 4 CIT 7, 544 F.Supp. 194 (1982).

### III. ITC Findings Regarding the PC Strand Industry

Against this background, the ITC found, in essence, in each of the four investigations, that the domestic PC strand industry was not suffering material injury or threatened with material injury. While the Commission did not make an explicit ultimate finding to this effect, there can be no doubt that this was the thrust of each of its determinations. The agency's path in this regard is clearly discernible. *See Bowman Transp., Inc. v. Arkansas-Best Freight*

*System, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974); *Colorado Interstate Gas Co. v. FPC,* 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206 (1945). Thus, in the Brazil investigation, the Commission found:

>    As we have observed in the other recent PC strand investigations, many of the important economic factors which the Commission considers indicate that the condition of the U.S. industry is generally healthy. Domestic production increased steadily and significantly from 1979 through 1981, although the period January-September 1982 showed some decline when compared to the same period in 1981. U.S. producers' shipments of PC strand followed the same general trend. U.S. productive capacity increased throughout the period under consideration, including a very marked increase in the January-September 1982 period compared to the corresponding period in 1981. Two domestic producers recently increased their productive capacity significantly. Notwithstanding the increased capacity of the domestic producers, domestic capacity utilization remained at relatively high levels throughout the entire period, falling only during the first nine months of 1982. Almost all of the recent decline in domestic capacity utilization is accounted for by the increased domestic productive capacity.

>    Employment, when measured by the number of production and related workers and by hours worked, showed no significant changes during the period 1979 through September 1982, although some decline is evident during the first nine months of 1982 compared to the first nine months of 1981. Hourly wages, total compensation, and worker productivity have all increased substantially.

>    The only significant negative trend in this industry is that of profitability. Although the industry's net sales increased from 1979 to 1981, net profits declined and net losses occurred during the first nine months of 1982. In this investiga-

tion, we do not believe that the profitability data, standing alone, are sufficient, when all other factors are considered, to support a finding of material injury or threat of material injury.

USITC Pub. 1358, at 4–6 (Mar. 1983) (footnotes omitted). The Commission made virtually identical findings in the other three investigations. *See* USITC Pubs. 1343, at 4–6 (Feb. 1983) (United Kingdom); 1325, at 4–6 (Dec. 1982) (France); 1281, at 4–6 (Aug. 1982) (Spain).

### IV. Evidence in the Record Regarding Material Injury

#### A. Economic Factors

▮ Examination of the record of the four investigations demonstrates that there is substantial evidence to support the finding that the domestic PC strand industry was not suffering material injury.[5] For the record shows the following:

Market demand for PC strand remained relatively constant during the periods of the investigations. It was not seriously affected by the recession or other forces that had an adverse impact on other segments of the steel industry. Indeed, the domestic industry expanded vigorously throughout the periods covered by the investigations—an expansion that appears to have resulted in part from a 1978 antidumping order issued against PC strand from Japan. 45 Fed.Reg. 57,599. Three producers entered the market in 1980, and domestic productive capacity was substantially greater for the first nine months of 1982 than it was for the whole of 1979.

Moreover, domestic strand production and shipments increased markedly in the period from 1979 to 1981, although they declined slightly in 1982. Capacity utilization too rose steadily after the 1978 antidumping order against Japan, even in the face of the major increases in productive capacity. That is, domestic producers' shipments grew even faster than their productive capacity. In addition, employment in the domestic industry was steady and actually increased through 1981, though it fell slightly in 1982.

Net sales figures likewise increased throughout the period under investigation, although they showed some decline during 1982. Domestic producers were not required to warehouse excessive production, with inventory levels remaining virtually constant throughout the period of the investigations, increasing slightly only during 1982.

The domestic industry had no trouble raising capital, as demonstrated by its capital expenditures for new plants and equipment and by its interest expenses for working capital and new capital investments. What is more, the domestic producers have grown rapidly and gained an ever-increasing share of the domestic market.

In fact, the record reveals only one negative factor—lack of profitability during 1982. Looking at the industry as a whole, however, it had a net profit in every year except 1982, and the loss it experienced in the first nine months of 1982 was not significant in proportion to net sales. Moreover, if operating profit is considered, the domestic industry was profitable in every year. The loss in 1982, therefore, was accounted for by non-operating expenses, which appear related to the domestic industry's large increase in capacity during 1982. Given this capacity increase—with its attendant capital costs and diseconomies of scale while the capacity came on stream—the performance of the domestic industry appeared extremely strong.

Plaintiffs, however, contend that the losses suffered by the domestic industry during the last nine months of 1982 pre-

---

**5.** In these four proceedings, the period of investigation covered 1979 through the first quarter of 1982 for Spain, 1979 through the second quarter of 1982 for France, and 1979 through the third quarter of 1982 for the United Kingdom and Brazil. Plaintiffs contend that the alleged injury to the domestic industry was becoming more severe during 1982. But if the Commission had substantial evidence to find no material injury in the Brazil investigation, it would be clearly justified in finding no material injury in the earlier investigations on Spain and France.

clude any finding that the industry is healthy and mandate a finding of material injury. But profitability is only one of the factors to be considered by the ITC. This does not denigrate its importance to the Commission's analysis of material injury, but it does underscore the legislative intent that absence of profits shall not act as a proxy for injury. Whatever the importance of a particular factor, the ITC is obligated "to consider and weigh a number of other pertinent economic and financial criteria, and consider all the facts and circumstances, including the health of the domestic industry." *SCM Corp. v. United States,* 4 CIT 7, 13, 544 F.Supp. 194, 199 (1982) (affirming ITC's determination that, in light of other economic factors, significant market penetration by imports, standing alone, was insufficient basis for finding of injury). *See Armstrong Bros. Tool Co. v. United States,* 84 Cust.Ct. 16, 28, C.D. 4838, 483 F.Supp. 312, 322, *aff'd,* 67 CCPA 94, C.A.D. 1252, 626 F.2d 168 (1980).

Under the circumstances, substantial evidence supported the Commission's conclusion that the industry was not suffering material injury, notwithstanding the loss it suffered in 1982—a loss that was not unusual considering the industry's rapid expansion in that period. It was thus reasonable for the ITC to find that the loss was insufficient to outweigh other significant economic factors, including increased productive capacity, increased shipments, and all the other indicia of a healthy industry.[6]

### B. *Time Frame of ITC Analysis*

In addition to criticizing the weight given by the ITC to various economic factors, plaintiffs challenge the time frame used in the agency's analysis of the industry. They allege that the ITC "should have conducted its review on a quarterly basis, rather than a calendar year basis, in its material injury investigation," and that it should

have concentrated on the most recent quarters, *i.e.,* the first three quarters of 1982.

■ But the ITC is not required by statute to use any particular time frame for its analysis, although it generally focuses on annual time periods. At best, plaintiffs can point to excerpts from the legislative history indicating that data *may* be considered on a quarterly basis. *See* H.R.Rep. No. 317, 96th Cong., 1st Sess. 47–48 (1979) (quarterly analysis of increases in market penetration is appropriate in some investigations of *threat* of material injury). This is hardly a mandate for quarterly analysis on demand of petitioners.

■ Plaintiffs have failed to demonstrate that the ITC's use of its standard annual analysis constituted error. Plaintiffs' preference for quarterly analysis (with the accent on more recent quarters) is based, apparently, on a decline in certain trends toward the close of the time period analyzed by the ITC. However, it was reasonable for the ITC to rely on its customary annual analysis since the investigations showed considerable fluctuation in quarter-by-quarter data, analysis of which would distort significant longer term trends. For example, just as limiting examination to quarters in 1980 would have produced an erroneously optimistic picture of the industry, concentration on corresponding quarters in 1982, as urged by plaintiffs, would have exaggerated negative indicia of the industry's condition.

### C. *Reconstituted Industry*

■ Plaintiffs further argue that the industry was "reconstituted" following the 1978 antidumping order on Japanese strand. In their view, the "reconstruction" was completed in the first quarter of 1981 and the Commission should have used the period of time following that quarter as the base for measuring the performance of the

---

**6.** Plaintiffs further argue that the Commission failed to consider the bankruptcy in August 1982 of Pan American Ropes "as an indicator of the material injury suffered by the domestic industry." The argument lacks merit. The record showed that Pan American Ropes was a producer of a variety of wire products and only a marginal and recent producer of PC strand. Considering its minimal role in the PC strand industry, its demise is inconsequential to the overall performance of the industry.

domestic industry, rather than using as a base the year 1979, when the industry was allegedly recovering from the deleterious effects of dumped Japanese imports.

Plaintiffs' "reconstituted industry" argument rests on the theory that the industry was changed radically by the 1978 antidumping order against Japan, which led, plaintiffs say, to the increases in domestic capacity and production found by the ITC. According to plaintiffs, the rising indicators betokened domestic industry retaking its rightful position in the market rather than staking out new ground.

Nevertheless, the domestic industry that existed before 1978 is basically the same industry that exists today. Plaintiffs have failed to show how either the entry of new firms or the industry's growth changed the nature of that industry. Nor have they shown how such changes could or should make a difference in the Commission's analysis under the law.

Moreover, even assuming that the industry was "reconstituted" in 1979, that alone is significant support for the Commission's finding of no material injury. It indicates that large producers saw a sufficient likelihood of long term profitability to enter into the United States market in a major way, despite the obvious short term losses that the commencement of operations would entail.[7]

### V. Threat of Material Injury

█ Where the ITA has found subsidies or dumping, the ITC is required to determine whether a domestic industry has been materially injured or *threatened* with material injury. 19 U.S.C. §§ 1671d(b)(1)(A) and 1673d(b)(1)(A) (1982). Having held that substantial evidence in the administrative record supports the ITC determination that the domestic PC strand industry has not

been materially injured, the court now turns to the question of threat of material injury.

In each of its four investigations, the ITC determined that the domestic PC strand industry was not threatened with material injury by the subject imports. In this regard, plaintiffs challenge only the Spanish determination. They argue that Spanish capacity to produce strand is increasing and that this will result in increased strand exports to the United States.

The difficulty with this argument is that the mere fact of increased capacity does not *ipso facto* imply increased exports to the United States. The information of record, in fact, is that there would be no such significant increase. Thus, the sole U.S. importer of Spanish strand estimated only a minor increase in imports from 1981 to 1982—and from the record, there was no reason to doubt his assessment of the market. This information is significant because it evidences the intentions of the importer, and when forecasting future import levels, intentions are "a proper ... element." *Matsushita Elec. Indus. Co. v. United States,* 6 CIT ——, ——, 569 F.Supp. 853, 857, *motion for rehearing denied,* 6 CIT ——, 573 F.Supp. 122 (1983). A Commission finding that levels of imports will increase must be based on "positive evidence tending to show an intention to increase the levels of importation." *Id.* The mere existence of increased Spanish capacity to produce strand—the only information cited by plaintiffs—is not such "positive evidence."

In further support of their contention of threat of material injury, plaintiffs take Spanish import data for the first four months of 1982 and conclude that full-year 1982 import data would be three times greater. This argument ignores the

---

**7.** Plaintiffs also argue that in the Spain, France, and Brazil investigations, the Commission illegally conducted a regional industry investigation, looking only at Florida and Texas and thus concluding that the domestic industry was not injured because producers in these two states were healthy. There is no merit to the argument. The fact is that in each of these investi-

gations the ITC considered the condition of the *entire* industry. Indeed, virtually all the data submitted to the Commission—including data on profitability, production, capacity utilization, and productivity—were industry-wide data. It was this information that the Commission discussed in its written opinions and on which it relied to find the industry not injured.

record. As stated by the Commission, there is no indication that the accumulation by the U.S. importer of inventories of Spanish strand was "related to any cause other than the vagaries of ocean transportation...." USITC Pub. 1281, at 11. Ocean transport, the Commission noted, is erratic, and "[s]ometimes orders placed several months apart will arrive in the United States at the same time." *Id.* at A–13. These statements are borne out by quarterly import statistics. Given these considerations, the ITC had ample reason to find that the import figures for January through April 1982 did not evidence a trend of increasing imports.[8]

Therefore, there is substantial evidence that imports were not increasing and that

there was no intent to increase such imports. Accordingly, the ITC's conclusion that there was no threat of material injury by reason of strand imports from Spain is sustained.

*Order*

For the foregoing reasons, plaintiffs' motion for judgment on the agency record is denied and the negative injury determinations of the ITC are affirmed.[9]

---

**8.** In the last analysis, plaintiffs' contention that Spanish imports would tend to increase and thus would threaten material injury to the domestic industry is based on speculation. But, for purposes of a finding of threat of injury, more than speculation is required. "An ITC affirmative determination with respect to threat of material injury must be based upon information showing that the threat is real and injury is imminent, not a mere supposition or conjecture." S.Rep. No. 249, 96th Cong., 1st Sess. 88–89, *reprinted in* 1979 U.S.Code Cong. & Ad. News 474–75. *Accord* H.R.Rep. No. 317, 96th Cong., 1st Sess. 47 (1979). *See also Alberta Gas Chems., Inc. v. United States,* 1 CIT 312, 324–25, 515 F.Supp. 780, 791 (1981).

**9.** As indicated previously, an affirmative injury finding requires *both* (1) that the domestic in-

dustry be materially injured (or threatened with material injury), and (2) that such injury be by reason of the unfairly traded imports. Since the court has concluded that there is substantial evidence to support the Commission's conclusion that the domestic industry was not materially injured or threatened with material injury, such findings are dispositive of this litigation. Hence, the court does not reach the other issues raised by plaintiffs, *i.e.,* that the Commission (1) erred in failing to cumulate the injurious effects of imports from the four countries under investigation, and (2) erroneously determined that even assuming *arguendo* the existence of material injury, such injury was not caused by the subject imports.