**Slip Op. 04-75**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____
                                         :
BRATSK ALUMINUM SMELTER and              :
RUAL TRADE LIMITED,                      :
                                         :
          Plaintiffs,                    :
                                         :
          and                            :
                                         :
SUAL HOLDING and ZAO KREMNY; and         :
GENERAL ELECTRIC SILICONES LLC,          :
                                         :
          Plaintiff-Intervenors,         :       Consol. Court No.
                                         :       03-00200
          v.                             :
                                         :
UNITED STATES,                           :
                                         :
          Defendant,                     :
                                         :
          and                            :
                                         :
GLOBE METALURGICAL INC. and              :
SIMCALA, INC.,                           :
                                         :
          Defendant-Intervenors.         :
_____ :

This consolidated action concerns the motions of Brastk Aluminum Smelter ("Brastk") and Rual Trade Limited and plaintiff-intervenors, SUAL Holding, ZAO Kremny and General Electric Silicones LLC ("General Electric") (collectively, "Plaintiffs") pursuant to USCIT R. 56.2 for judgment upon the agency record challenging certain aspects of the United States Trade Commission's ("ITC" or "Commission") final determination entitled Silicon Metal from Russia ("Final Determination"), 68 Fed. Reg. 14,260 (Mar. 24, 2003), in which the ITC found that an industry in the United States is materially injured by reason of imports of silicon metal from Russia that are sold in the United States at less than fair value ("LTFV"). The views of the Commission were published in March 2003, in Silicon Metal From Russia ("ITC Determination"), Inv. No. 731-TA-991 (Final), USITC Pub. 3584 (Mar. 2003). Plaintiffs generally argue that the Commission erred in determining that the domestic silicon metal industry was materially injured by reason of

silicon metal imports from Russia.   Specifically, Plaintiffs contend, <u>inter alia</u>, that the ITC erred in concluding that: (1) the silicon metal prices in all three market segments key off the price for secondary aluminum grade silicon metal; (2) Russian imports were priced lower than non-subject imports; and (3) Russian imports caused injury to the United States domestic industry.

**Held**: Plaintiffs' motions for judgment on the agency record is granted in part and denied in part.   Case remanded to the Commission with instructions: (1) to explain its reasons for accepting evidence that "spot" prices may effect contract prices while rejecting contradictory evidence; (2) to explain the significance or effect of the similar pricing trends of the different market segments; and (3) if the Commission cannot provide sufficient reasons or explanations, to change its determination accordingly.

[Plaintiffs' 56.2 motions is granted in part and denied in part. Case remanded.]

<u>Shearman & Sterling LLP</u> (<u>Thomas B. Wilner</u>, <u>Jeffrey M. Winton</u>, <u>Quentin M. Baird</u> and <u>Sam J. Yoon</u>) for Brastk Aluminum Smelter and Rual Trade Limited, plaintiffs.

<u>Dewey Ballantine LLP</u> (<u>Michael H. Stein</u> and <u>Nathaniel M. Rickard</u>) for General Electric Silicones LLC, plaintiff-intervenor.

<u>Vorys, Sater, Seymour and Pease LLP</u> (<u>Frederick P. Waite</u> and <u>Kimberly R. Young</u>) for SUAL Holding and ZAO Kremny, plaintiff-intervenors.

<u>Lyn M. Schlitt</u>, General Counsel; <u>James M. Lyons</u>, Deputy General Counsel, Office of the General Counsel, United States International Trade Commission (<u>Irene H. Chen</u> and <u>Andrea C. Casson</u>) for the United States, defendant.

<u>Piper Rudnick LLP</u> (<u>William D. Kramer</u>, <u>Clifford E. Stevens, Jr.</u> and <u>Martin Schaefermeier</u>) for Globe Metalurgical Inc. and SIMCALA, Inc., defendant-intervenors.

Dated:  June 22, 2004

**OPINION**

**TSOUCALAS, Senior Judge:** This consolidated action concerns the motions of Brastk Aluminum Smelter ("Brastk") and Rual Trade Limited and plaintiff-intervenors, SUAL Holding, ZAO Kremny and General Electric Silicones LLC ("General Electric") (collectively, "Plaintiffs") pursuant to USCIT R. 56.2 for judgment upon the agency record challenging certain aspects of the United States Trade Commission's ("ITC" or "Commission") final determination entitled <u>Silicon Metal from Russia</u> ("<u>Final Determination</u>"), 68 Fed. Reg. 14,260 (Mar. 24, 2003), in which the ITC found that an industry in the United States is materially injured by reason of imports of silicon metal from Russia that are sold in the United States at less than fair value ("LTFV"). The views of the Commission were published in March 2003, in <u>Silicon Metal From Russia</u> ("<u>ITC Determination</u>"), Inv. No. 731-TA-991 (Final), USITC Pub. 3584 (Mar. 2003). Plaintiffs generally argue that the Commission erred in determining that the domestic silicon metal industry was materially injured by reason of silicon metal imports from Russia. Specifically, Plaintiffs contend, <u>inter alia</u>, that the ITC erred in concluding that: (1) the silicon metal prices in all three market segments key off the price for secondary aluminum grade silicon metal; (2) Russian imports were priced lower than non-subject imports; and (3) Russian imports caused injury to the

United States domestic industry.

## BACKGROUND

On March 7, 2002, the United States domestic industry filed an antidumping petition with the Commission alleging that it was materially injured or threatened with material injury by reason of LTFV imports of silicon metal from Russia. See Final Determination, 68 Fed. Reg. at 14,260. On April 29, 2002, the Commission published its preliminary determination that there was a reasonable indication that the United States domestic industry is materially injured by reason of LTFV imports of silicon metal from Russia. See Silicon Metal From Russia, 67 Fed. Reg 20,993 (Apr. 29, 2002). The United States Department of Commerce ("Commerce") published its final determination that imports of silicon metal from Russia are being, or are likely to be sold in the United States at LTFV, see Notice of Final Determination of Sales at Less Than Fair Value for Silicon Metal From the Russian Federation, 68 Fed. Reg. 6,885 (Feb. 11, 2003), and subsequently published an amended final determination. See Notice of Amended Final Determination of Sales at Less Than Fair Value for Silicon Metal From the Russian Federation, 68 Fed. Reg. 12,037 (Mar. 13, 2003). On March 26, 2003, Commerce published an antidumping duty order with regard to silicon metal from Russia. See Antidumping Duty

<u>Order on Silicon Metal From Russia</u>, 68 Fed. Reg. 14,578 (Mar. 26, 2003).

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(I) (2000) and 28 U.S.C. § 1581(c) (2000).

## STANDARD OF REVIEW

The Court will uphold an ITC determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2000). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 477 (1951) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the [same] evidence does not prevent an administrative agency's finding from being supported by substantial evidence." <u>Consolo v. Fed. Mar. Comm'n</u>, 383 U.S. 607, 620 (1966). Moreover, "[t]he court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly

conflicting views, even though the court would justifiably have made a different choice had the matter been before it <u>de novo</u>.'" <u>American Spring Wire Corp. v. United States</u>, 8 CIT 20, 22, 590 F. Supp. 1273, 1276 (1984) (quoting <u>Universal Camera</u>, 340 U.S. at 488).

## DISCUSSION

## I.   Statutory Background

In the final phase of an antidumping and countervailing duty investigation, the Commission determines whether a United States industry is materially injured by reason of subject imports. <u>See</u> 19 U.S.C. §§ 1671d(b)(1), 1673d(b)(1) (2000). Material injury is defined as "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A) (2000). In making a material injury determination, the ITC must consider: (1) the volume of the subject imports; (2) the subject imports' effect on prices for the domestic like product; and (3) the impact of the subject imports on the domestic industry in the context of production operations within the United States. <u>See</u> 19 U.S.C. § 1677(7)(B). In addition to these factors, the ITC "may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports." 19 U.S.C. § 1677(7)(B)(ii). The statute explicitly describes the factors the ITC should

consider in making its determination as to volume, price and the impact on the affected domestic industry, see 19 U.S.C. § 1677(7)(C), yet no single factor is dispositive. See 19 U.S.C. § 1677(7)(E)(ii).

In evaluating the effect of subject imports on domestic prices, the Commission must consider whether there has been significant price underselling compared with the price of domestic like products in the United States. See 19 U.S.C. § 1677(7)(C)(ii)(I). The Commission also considers whether subject imports depress, suppress or prevent domestic price increases to a significant degree. 19 U.S.C. § 1677(7)(C)(ii)(II). In considering the impact of the subject imports, the ITC must assess "all relevant economic factors which have a bearing on the state of the [United States] industry." 19 U.S.C. § 1677(7)(C)(iii). In addition, the ITC must consider such economic factors "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." Id.

## II. The Commission Properly Determined that Subject Import Volume Was Significant

### A. The ITC's Findings

In the case at bar, the Commission found that the volume and increase in volume of subject imports was significant. See ITC

<u>Determination</u> at 10-11.  The ITC found that the quantity of subject imports increased by 35.8 percent from 1999 to 2001 and by 38.6 percent from 2000 to 2001, after registering a slight decrease from 1999 to 2000.  <u>See</u> <u>id.</u> at 10.  Moreover, the overall volume of subject imports was 57.6 percent higher during the January to September 2002, period than it had been during the comparable period in 2001, which allowed Russia to become the largest single source of silicon metal imports during the 2002 period.  <u>See</u> <u>id.</u> The Commission also noted that "subject import volume increased during the [period of investigation] despite the inability of Russian producers to manufacture low-iron silicon metal due to the composition of quartzite deposits in Russia."[1]  <u>Id.</u>  The ITC found that "[s]ubject imports gained market share [in the United States] at the same time that apparent [United States] consumption declined . . . from 62.2 percent in 1999 to 57.0 percent in 2000 and 54.6 percent in 2001, and was 39.7 percent in interim 2002 compared to 55.4 percent in interim 2001."  <u>Id.</u>  From 1999 to 2000, non-subject imports' market share decreased from 35.5 percent to 33.2 percent and domestic producers' market share also fell from 57.0 percent to 54.6 percent while the market share of subject imports rose from

---

[1]     Quartzite is the primary raw material needed to produce silicon metal.  <u>See</u> <u>ITC Determination</u> at I-7.  The mined quartzite "is combined with a carbon-containing reducing agent . . . and a bulking agent . . . in a submerged-arc electric furnace to produce molten silica, which is reduced to silicon metal."  <u>Id.</u>

7.5 percent to 12.3 percent.  See id. at 9-10.

     B.    Contentions of the Parties

          1.    Plaintiffs' Contentions

     Plaintiffs contend that Russian producers cannot compete in
the primary aluminum market because of their inability to produce
low-iron silicon metal.  See Br. Pls.' Brastk & Rual Trade Ltd. &
Pl.-Intervenor General Electric Supp. Pls.' R. 56.2 Mots. J. Agency
R. ("Plaintiffs' Br.") at 9.   Plaintiffs concede that "[t]he
silicon metal products sold by [United States] producers are
generally interchangeable with the products imported from Russia
and from other countries."  Id.  The production of low-iron silicon
by Russian producers, however, is generally impractical because the
quartzite used by Russian producers has a high level of iron.
See id.  Plaintiffs argue that United States producers, in turn,
"target their production specifically to meet the requirements of
the primary aluminum segment."  Id.

     In addition, Plaintiffs argue that the ITC should have used
1998 rather than 1999 as the starting point for its volume
analysis.  See id. at 44 n.99.  In doing so, the Commission "would
have found that imports from Russia had actually decreased
throughout the investigation period."  Id.  Plaintiffs also note
that Russian imports peaked in 1994, totaling 62,990 tons but fell

in 1999 to 25,158 tons and further declined in 2000 to 24,463 tons. See id. at 12. In contrast, non-subject imports showed an opposite trend with imports increasing between 1994 and 2000. See id. Plaintiffs maintain that the data supports a finding that "the volume of non-subject imports dwarfed the volume imported from Russia during the last three years." Id. Accordingly, Plaintiffs contend that non-subject imports "were a much larger factor in the [United States] market than imports from Russia." Id. at 13.

### 2. ITC's Contentions

The Commission replies that its subject import volume findings were reasonable and supported by substantial evidence. See Def. ITC's Opp'n Pls./Pl.-Intervenors' Mots. J. Agency R. ("ITC's Br.") at 15-19. The volume of subject imports "climbed by 35.8 percent from 1999 to 2001 and by 38.6 percent from 2000 to 2001." Id. at 15. Moreover, the overall volume of subject imports was higher between January to September of 2002 than it had been during the same period in 2001. See id. at 17. In contrast, non-subject import volume did not increase as much during the same period. See id. at 17. The ITC maintains that the "substantial and continued increase occurred as Russia became the largest source of silicon metal imports prior to suspension of liquidation in 2002, despite the inability of Russian producers to produce low-iron silicon metal for the primary aluminum market." Id. at 15-16.

The ITC also asserts that respective market share trends of the domestic industry, subject and non-subject imports during the period of investigation further supports its volume findings. The ITC concedes that, in the 1999 to 2000 period, non-subject imports' market share rose while the domestic industry lost market share and subject imports' market share remained flat. See id. at 16. During the 2000 to 2001 period, however, the market share of subject imports increased at the expense of non-subject imports and domestic producers. See id. The Commission asserts that it attributed part of the domestic industry's market share loss to non-subject imports "but, in light of the absolute and proportional increases by subject imports in interim 2002, [it] reasonably concluded that the domestic industry lost market share in significant part to subject imports." See id. at 16-17 (quotation omitted).

The ITC further points out that the chemical and not primary aluminum segment is the domestic industry's largest customer market. See id. at 17. In 2001, the primary aluminum market segment was third in terms of the percentage of United States producers' domestic shipments. See id. at 17-18 (citing proprietary information). The Commission found that "subject import suppliers' percentage of domestic silicon metal shipments to the chemical sector, where the majority of domestic product

competes, increased substantially during the [period of investigation]." Id. at 18.

The Commission maintains that it followed its usual practice of collecting and analyzing data for a three year period. See id. Here, the Commission analyzed data from 1999 to 2001 and interim periods January to September 2001 and 2002. See id. The ITC asserts that its period of investigation customarily consists of the most recent three calendar years and applicable interim periods. See id. During the final investigation, Plaintiffs requested that the period of investigation be expanded, but the Commission found that "plaintiffs provided no good reason for this deviation from the [period of investigation], other than that it might skew the data more favorably for them." Id. at 19. The ITC declined to expand the period of investigation because it reasoned that such an expansion to include volume data without obtaining relevant price and market conditions would yield an incomplete analysis. See id.

### 3. Defendant-Intervenors' Contentions

Defendant-Intervenors generally agree with the arguments made by the ITC. See Def.-Intervenors' Br. Opp'n Mots. J. Upon Agency R. ("Defendant-Intervenors' Br.") at 18-20. Defendant-Intervenors add that "Russian imports continued to flood the [United States]

market during the first three quarters of 2002." Id. at 19.  Over the period of investigation, the share of the United States silicon metal market more than doubled for Russian imports, while United States producers' market share declined by twenty percent.  See id.

### C.   Analysis

With respect to its volume determination, the Commission must consider whether the volume of subject imports is significant.  See 19 U.S.C. § 1677(7)(C)(i).  In reviewing the ITC Determination, the court's role is limited to determining whether the Commission's findings are supported by substantial evidence and the reasonable inferences therefrom.  See Daewoo Elecs. Co., Ltd. v. Int'l Union of Elec., Elec., Technical, Salaried & Mach. Workers, AFL-CIO, 6 F.3d 1511, 1520 (Fed. Cir. 1993).  Under this standard, the question for this Court is whether the record supports the Commission's conclusions.  See id.  While different conclusions may be drawn from record evidence, the Commission has the discretion to reasonably interpret the evidence and its significance.  See id. Accordingly, this Court "may not reweigh the evidence or substitute its judgment for that of the ITC."  Goss Graphics Sys., Inc. v. United States, 22 CIT 983, 1008-09, 33 F. Supp. 2d 1082, 1104 (1998) (quotation and citations omitted).

The Court finds that there is substantial evidence supporting the Commission's findings that subject import volume was significant. The volume of subject imports increased by 35.8 percent from 1999 to 2001 and by 38.6 percent from 2000 to 2001, after registering a slight decrease from 1999 to 2000. See ITC Determination at 10. In addition, the overall volume of subject imports was 57.6 percent higher during the January to September 2002, period than it had been during the comparable period in 2001. See id. From 1999 to 2001, non-subject imports' market share decreased from 35.5 percent to 33.2 percent and domestic producers' market share also fell from 57.0 percent to 54.6 percent while the market share of subject imports rose from 7.5 percent to 12.3 percent. See id. at 9-10. Based on record evidence, it was reasonable for the Commission to conclude that an increase of volume over the period of investigation was significant both in absolute terms and relative to consumption in the United States. See id. at 9–11.

Furthermore, Plaintiffs' arguments as to the period of investigation used by the ITC are without merit. Plaintiffs contend that if the ITC had used 1998 as the starting point for its volume analysis, the Commission would have found that the volume of subject imports decreased during the period of investigation. See Plaintiffs' Br. at 44 n.99. The statute, however, does not direct

the ITC to use a specific period of time for its analysis. Accordingly, "the Commission has discretion to examine a period that most reasonably allows it to determine whether a domestic industry is injured by LTFV imports." Kenda Rubber Indus. Co., Ltd. v. United States, 10 CIT 120, 126-27 , 630 F. Supp. 354, 359 (1986); see Usinor, Beautor, Haironville, Sollac Atlantique, Sollac Lorraine v. United States, 26 CIT ___, ___, 2002 Ct. Intl. Trade LEXIS 98 *32-*33 (stating that "in making a present material injury determination, the Commission must address record evidence of significant circumstances and events that occur between the petition date and vote date"). The Court recognizes that "older information on the record provides a historical backdrop against which to analyze fresher data."[2] Usinor, 26 CIT at ___, 2002 Ct. Intl. Trade LEXIS 98 at *34. Here, the ITC properly exercised its discretion and followed its usual practice of collecting and analyzing data for a three year period. The Commission reasonably determined that using earlier volume data without obtaining price and market condition data would lead to an incomplete analysis. Accordingly, the Commission's volume determination is affirmed.

---

[2] The ITC has previously acknowledged that "the time period for which [it] collects data -- three years in most cases -- merely serves as a historical frame of reference for an analysis of the current condition of the domestic industry at the time of the Commission's determination." 12-Volt Motorcycle Batteries From Taiwan, Inv. No. 731-TA-238 (Final), USITC Pub. 2213 at 11, (Aug. 1989).

## III. The Commission's Determination That There was Significant Underselling by Subject Imports

### A.    The Commission's Findings

The ITC found that the subject imports and the domestically produced silicon metal are generally substitutable. See ITC Determination at 11. The ITC also found, and the parties agreed, that "price is very important in purchasing decisions, given the commodity-like nature of the subject product." Id. at 11-12. The Commission concluded that silicon metal prices in the primary, secondary and chemical market segments key off the price for secondary aluminum. See id. at 12. The data collected showed that Russian silicon metal produced for the primary and secondary market segments undersold comparable domestic products. See id. The data also showed that subject imports were priced below the domestic product in thirteen out of fifteen quarterly pricing comparisons for primary aluminum grade silicon metal. See id. For secondary aluminum grade silicon metal, subject imports were priced below the domestic product in eleven out of fifteen quarters. See id. "Purchaser price data [also showed] underselling by Russian imports in all quarterly comparisons." Id. Subject imports undersold the domestic product in all eleven quarters for all three aluminum grades of silicon metal that were reviewed by the ITC. See id. In addition, purchase price data showed that Russian silicon metal undersold non-subject imports. See id. at 13. Subject imports had

never been the lowest priced product in the United States market throughout the period of investigation. <u>See</u> <u>id.</u> The Commission found that the average unit value ("AUV") of imports from Russia were lower than the aggregate AUVs of non-subject imports. <u>See</u> <u>id.</u> Based on this pricing data, the ITC determined that the underselling by subject imports was significant during the period of investigation. <u>See</u> <u>id.</u>

Prices in all three silicon metal segments declined during the period of investigation for the United States product and the subject imports, but the ITC found significant price depression by the subject imports. <u>See</u> <u>id.</u> at 14. The Commission noted that non-subject import prices "have had an independent price depressive effect on domestic silicon metal prices." <u>Id.</u> at 15. The ITC, however, determined that "given the significant underselling by subject imports, subject import volume surges during the [period of investigation], and the high degree of substitutability between subject imports and domestic product . . . subject imports themselves have significantly depressed domestic silicon metal prices in all three customer segments . . . ." <u>Id.</u> Based on a comparison of purchaser data to the domestic product, the ITC found that the underselling margins for subject imports were the highest for chemical grade silicon, the market segment where most domestic product is sold. <u>See</u> <u>id.</u>

   B.   The Commission's Finding that Silicon Metal Prices Key
        Off the Secondary Aluminum Price

        1.   Contentions of the Parties

             a.    Plaintiffs' Contentions

Plaintiffs contend that the Commission's conclusion— that silicon metal prices in all three market segments key off published "spot" prices for secondary aluminum grade silicon metal— is not supported by substantial evidence. See Pls.' Br. at 20-25. Plaintiffs take issue with the ITC's explanation of the way in which prices in the market segments are set.

> The record in this investigation indicates that domestically produced silicon metal and subject imports are generally substitutable, and that price is a key factor in purchasing decisions. The parties agree that price is very important in purchasing decisions, given the commodity-like nature of the subject product. In addition, silicon metal prices in all three segments key off secondary aluminum price and exhibit similar trends.

ITC Determination at 11-12 (citations omitted). Plaintiffs specifically argue that the ITC improperly accepted petitioners assertion that "spot" prices for silicon metal in the secondary aluminum segment, published in the industry publication Metals Week, key off pricing for all segments of the market. See id. at 20. Plaintiffs assert that, "the ITC's subsequent analysis of the price effects of the imports from Russia was explicitly based on this 'finding,'" which lacked factual support. Id. at 21.

Plaintiffs maintain that the ITC was unable to cite any data from its staff report, any testimony from the hearing, or any admissions from respondents to support its finding. See id. Rather, the Commission found support for its conclusion in "a passage in petitioners' pre-hearing brief, which actually referred back to a ten-year-old ITC determination, and not to any evidence on the record of the current proceeding." Id. Plaintiffs argue that there is overwhelming record evidence which demonstrates that prices in the other market segments were not effected by the published "spot" prices for the secondary aluminum segment. See id. at 22. Plaintiffs assert that the testimony of the purchasing manager of General Electric, which explained how published "spot" prices for the secondary aluminum segment effect her contracts, shows that "spot" prices "had absolutely no effect on the pricing in contracts in the chemical market segment." Id. at 23. Additionally, the "metal markets index" had no bearing on the price of contracts in the chemical segment. See id. Plaintiffs maintain that price in the chemical market segment for General Electric was "set based on [an] analysis of the price her company could pay while remaining profitable . . . ." Id.

While the silicon metal products sold by United States producers are interchangeable with those imported from Russia and other countries, the high level of quartzite used by Russian

producers makes it "generally impractical for the Russian producers to produce silicon metal meeting the low-iron requirements of the primary aluminum market segment." Reply Br. Pls.' Brastk & Rual Trade Ltd. & Pl.-Intervenor General Electric Supp. Pls.' R. 56.2 Mots. J. Agency R. at 4. United States producers, on the other hand, target their production for the primary aluminum segment, yet most of their sales in the United States are in the chemical market segment. See id. at 4-5; Pls.' Br. at 9.

The ITC's questionnaire to silicon metal purchasers asked about the relationship of contract prices to "spot" prices. See Pls.' Br. at 23. Three of seven purchasers responded that there is no relationship between contract and "spot" prices. See id. at 24. Three other purchasers claimed that "spot" prices were a factor in determining contract prices, but that there may not be a direct relationship between the two prices. See id. The last purchaser stated that a price differential ranging from $0.05 and $0.10 between the two prices had been generally observed. See id. Based on these responses, Plaintiffs contend that "the ITC's erroneous analysis of the impact of the prices in the secondary aluminum segment was the entire foundation of its decision that the [United States] producers had been harmed in the chemical segment–which was the only segment where [petitioners] actually complained about imports from Russia." Id. at 25.

### b.    ITC's Contentions

The ITC asserts that there was ample evidence to support its finding, in its price effects analysis, that silicon metal prices in all three segments key off published "spot" prices for the secondary aluminum segment. See ITC's Br. at 22. Furthermore, the ITC asserts its determination must be reviewed by this Court as a whole, "even if it does not agree with the Commission on each and every subsidiary finding," and that the Court should affirm the ITC's determination if the record, as a whole, supports the determination. Id. The Commission points out that United States producers' price data indicated "similar pricing trends among the three segments . . . ." Id. The ITC maintains that record evidence showed that the "[s]pot prices published in Metals Week are used as a measure of prevailing market prices by buyers and sellers in all industry segments." Id. at 23. One domestic producer stated that its contracts had a pricing mechanism to periodically adjust prices based on prices published in Metals Week or Ryan's Notes. See id. Another domestic producer indicated that "its contract terms are generally fixed or indexed to prices published in Metals Week or Ryan's Notes depending on the customer and duration of [sic] contract." Id. The ITC asserts that Plaintiffs' depiction of its findings "belies their statement during the final investigation," that prices in the primary and

secondary segments moved virtually in tandem. See id. at 24.

The ITC concedes that their was testimony on the record which contradicted its determination. The ITC, however, asserts that such testimony "does not render the Commission's determination as a whole unsupported by substantial evidence." Id. Rather, the ITC has discretion to reasonably interpret evidence and "to determine the overall significance of any particular factor or piece of evidence." Id. Here, the Commission weighed all the evidence, including contradictory testimony, to reach its price effects determination. See id. at 24-25. The ITC maintains that it discussed "record evidence about the influence of spot prices on contracts in its conditions of competition section." Id. at 25.

### c.    Defendant-Intervenors' Contentions

Defendant-Intervenors assert that the ITC's price effects findings are reasonable and supported by substantial evidence. See Defendant-Intervenors' Br. at 20-24. Citing sales data for the secondary aluminum market, Defendant-Intervenors note that subject imports' prices in the secondary aluminum segment declined from the first quarter of 1999, to the fourth quarter of 2001 and continued to drop in the first quarter of 2002. See id. at 20-21 (citing proprietary information). Similarly, prices for subject imports in the primary aluminum market dropped from the first quarter in 1999

to the fourth quarter of 2001. See id. (citing proprietary information). Defendant-Intervenors also argue that the record supports the ITC's conclusion that subject imports depressed the prices of non-subject imports. See id. at 22. Defendant-Intervenors maintain that at the beginning of the period of investigation "the import AUV of non-subject imports was more than $200/[short tons] higher than the AUV of the Russian imports." Id. Defendant-Intervenors maintain that "[a]s the Russian imports surged into the [United States] market in 2001, the prices of non-subject imports were pulled down and this spread narrowed to $98/[short tons]." Id. Subject imports, however, fell to their lowest AUV during the period of investigation in the January to September 2002 period, and the price gap increased to $191/short tons. See id. Nonetheless, Defendant-Intervenors maintain that the import AUV data supports the ITC's determination that the subject imports depressed the prices of both the domestic product and non-subject imports. See id.

### 2. Analysis

The Commission has "broad discretion in analyzing and assessing the significance of the evidence on price undercutting." Cooperweld Corp. v. United States, 12 CIT 148, 161, 682 F. Supp. 552, 565 (1988). Under 19 U.S.C. § 1677(7)(C)(ii)(I), the ITC must determine if "there has been significant price underselling by the

imported merchandise as compared with the price of domestic like products of the United States." The ITC must also consider whether the subject imports otherwise suppress, depress or prevent domestic price increases to a significant degree. See 19 U.S.C. § 1677(7)(C)(ii)(II). In the case at bar, the Commission found that silicon metal prices in all three market segments key off the secondary aluminum price. The ITC also found that subject imports depressed prices in the secondary aluminum market, which consequently affected prices in the other two segments as well. The Court finds that the Commission's conclusion that prices in all three segments key off secondary aluminum prices is not supported by substantial evidence.

The ITC failed to explain why it rejected certain evidence indicating that "spot" prices did not effect contract prices. Three out of seven responses to the ITC's questionnaires indicate that "spot" prices are a factor in determining contract prices, but "there may not be a direct relationship between spot and contract prices." See ITC Determination at 9. During its investigation, the ITC found that silicon metal sales in the United States are made on both a contract and "spot" price basis. See id. at 8. While United States producers reported that 95 percent of their sales are made on a contract basis, importers and purchasers reported that their sales were mixed: "some firms reporting that

all or the majority of sales are done on a spot basis and others reporting that all or the majority of sales are on a contract basis." Id. While United States producers indicated that most of their sales price terms were set within contracts, one producer indicated that its contracts "contain a pricing mechanism to adjust prices quarterly, semi-annually, or annually based on a published price like Metals Week or Ryan's Notes." Id. at 9. A different producer indicated that it had contracts with meet-or-release clauses. See id. Another producer indicated that its contract terms are either fixed or indexed to the prices contained in one of the two publications. See id. The Commission failed to reconcile contradicting evidence and provide a reasonable explanation as to why it chose the evidence used to support its findings.

The ITC gathered information from purchasers on whether prices were adjusted during the terms of contracts. See id. The data gathered indicates that "spot" prices did not key off secondary aluminum prices. When asked if prices vary within the duration of a contract in response to changes in "spot" prices, the majority of respondents indicated that prices did not vary. See id. In addition, five out of five respondents replied "in the negative when asked if any suppliers had actually changed prices during the period in which a contract with a meet-or-release clause was in place." Id. While the Commission found that three out of seven

respondents indicated that "spot" prices are a factor in determining contract prices, these respondents also indicated that "there may not be a direct relationship between spot and contract prices." Id.

Furthermore, the Commission notes that United States producers' price data indicated "similar pricing trends among the three segments . . . ." ITC's Br. at 22. Silicon metal sold to chemical producers was, on average, $0.10 per pound more expensive than that sold to primary aluminum producers. See id. The price for silicon metal sold to primary aluminum producers was on average $0.05 more expensive than that sold to secondary aluminum producers. See id. The ITC determined that record evidence showed that the "[s]pot prices published in Metals Week are used as a measure of prevailing market prices by buyers and sellers in all industry segments." Id. at 23. One domestic producer stated that its contracts had a pricing mechanism to periodically adjust prices based on prices published in Metals Week or Ryan's Notes. See id. Another domestic producer indicated that "its contract terms are generally fixed or indexed to prices published in Metals Week or Ryan's Notes depending on the customer and duration of [sic] contract." Id. The ITC asserts that Plaintiffs' depiction of the ITC's finding "belies their statement during the final investigation," that prices in the primary and secondary segments

moved virtually in tandem.  See id. at 24.  While the Court recognizes the broad discretion Congress granted to the Commission in analyzing evidence presented to it, the ITC's determinations must be reasonable and supported by substantial evidence.

In the case at bar, the evidence before the ITC allows for the drawing of two inconsistent conclusions from the same evidence. The Commission, however, has not sufficiently explained its reasons for concluding that silicon metal prices in all three segments effect pricing in the secondary aluminum market.  In addition, the Court finds that the Commission failed to explain the significance or effect of the similar pricing trends among the three market segments.  While the Court may not substitute its judgment for that of the ITC, see American Spring, 8 CIT at 22, 590 F. Supp. at 1276, the ITC's determination must be reasonable and supported by substantial evidence.  The record does not adequately explain the Commission's determination with respect to its price determination. Accordingly, the Court remands this issue to the ITC with instructions: (1) to explain its reasons for accepting evidence that "spot" prices may effect contract prices while rejecting contradictory evidence; (2) to explain the significance or effect of the similar pricing trends of the different market segments; and (3) if the Commission cannot provide sufficient reasons or explanations, to change its determination accordingly.

**CONCLUSION**

The Court finds that the ITC's determination with respect to volume was reasonable and supported by substantial evidence.  The case is remanded to the Commission with instructions: (1) to explain its reasons for accepting evidence that "spot" prices may effect contract prices while rejecting contradictory evidence; (2) to explain the significance or effect of the similar pricing trends of the different market segments; and (3) if the Commission cannot provide sufficient reasons or explanations, to change its determination accordingly.  The Court will consider the remaining issues raised by Plaintiffs upon review of the remand redetermination.

                                    /s/NICHOLAS TSOUCALAS
                                    **NICHOLAS TSOUCALAS**
                                    **SENIOR JUDGE**


Dated:     June 22, 2004
           New York, New York